1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF OREGON

3                     PORTLAND DIVISION

4
UNITED STATES OF AMERICA,          )
5                                  )
                       Plaintiff,  )  Case No. 3:18-cr-00475-IM
6                                  )
                  v.               )
7                                  )  April 13, 2022
DONTAE LAMONT HUNT,                )
8                                  )
                  Defendant.       )  Portland, Oregon
9    _____)

10

11

12

13                     MOTION HEARING

14                TRANSCRIPT OF PROCEEDINGS

15        BEFORE THE HONORABLE KARIN J. IMMERGUT

16           UNITED STATES DISTRICT COURT JUDGE

17

18

19

20

21

22

23

24

25

1                              APPEARANCES

2    FOR THE PLAINTIFF:
                            PETER D. SAX
3                           United States Attorney's Office
                            1000 SW Third Street
4                           Suite 600
                            Portland, OR 97204
5
     FOR THE PLAINTIFF:
6                           GARY Y. SUSSMAN
                            United States Attorney's Office
7                           1000 SW Third Street
                            Suite 600
8                           Portland, OR 97204

9    FOR THE DEFENDANT:
                            JOHN ROBB
10                          Kevin Sali LLC
                            1500 SW 1st Avenue
11                          Suite 1020
                            Portland, OR 97201
12
     FOR THE DEFENDANT:
13                          AMANDA A. THIBEAULT
                            Alvarez Thibeault LLC
14                          330 NE Lincoln Street
                            Suite 100
15                          Hillsboro, OR 97124

16

17

18

19

20

21

22   COURT REPORTER:    Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                        United States District Courthouse
23                      1000 SW Third Avenue, Room 301
                        Portland, OR 97204
24                      (503)326-8191

25                           *   *   *

TRANSCRIPT OF PROCEEDINGS

(April 13, 2022)

(In open court:)

       THE COURT:  Good morning, everyone.  Please be seated.  If you are fully vaccinated and boosted, you may remove your masks.  You're not required to.  It's totally up to you.

     Why don't I have the Government call the case.  Mr. Sax.

       MR. SAX:  Good morning, Your Honor.  Peter Sax and Gary Sussman for the United States.  We're here for a motions hearing and status conference in United States v. Dontae Lamont Hunt.  Case No. 18-cr-00475.  Defendant is present, in custody, being represented by his attorneys, John Robb and Amanda Thibeault.

       THE COURT:  Mr. Robb.

       MR. ROBB:  Good morning, Your Honor.  John Robb and Amanda Thibeault are here representing Dontae Hunt.  We're ready to proceed to argument on the defendant's motion to suppress and on a portion of the defendant's motion to -- motion to compel, and we're ready to proceed in whichever manner that the Court deems fit.

       THE COURT:  So it seemed to me -- let's start with argument on the motion to suppress, and then we can talk about the portion of the --

     Ms. Thibeault?

1          MS. THIBEAULT:  I was getting ready to go.  Sorry,

2    Judge.

3          THE COURT:  So we'll start with the motion to

4    suppress argument, and I had a couple of questions probably for

5    both sides on that, first.  And then I'll allow the defense to

6    do the opening argument, if you will, Government response, and

7    then you'll get the last word from the defense, since it's your

8    motion.

9          Then I'll address the portion of the discovery motion

10   regarding discovery from the RICO investigation of Mr. Jones,

11   and then I want to talk a little bit about what's next in the

12   case.  I know I have some deadlines for responding to the

13   speedy trial motion; so I did want to get that done with -- or

14   resolved quickly because, obviously, that changes the course of

15   things in the case, but -- so we can talk about that at the

16   end.  So I want to deal with housekeeping matters, in terms

17   scheduling, the possibility of a continuance, which I'm still

18   inclined not to grant, but we'll talk about that as -- after we

19   deal with the suppression motion and the Jones case files.

20         So let me first just pose a couple of questions to the

21   Government, which in -- if I'm understanding the argument in

22   your briefing correctly, it looks like the officers or

23   agents -- federal agents and Portland Police Bureau officers --

24   who are working on the drug trafficking investigation at some

25   point discover that the black iPhone that is discarded, left at

1    the scene back at the December 2017 shooting, where Mr. Hunt is

2    the victim, that at some point they discover that that is

3    Mr. Hunt's phone, and it was my impression that that may not be

4    until the officers actually execute the search on it.  But I'm

5    not sure about that.  I want to see in the record if there's

6    anything that tells me when they discover it's Mr. Hunt's

7    phone.  "Does that matter?" is another question.  And then in

8    terms of the abandonment argument.

9         And then at what point -- it seems to me that you make the

10   argument that there is not unreasonable delay because probable

11   cause doesn't really ripen for the phone's -- the 2017 phone's

12   connection to Mr. Hunt's drug trafficking allegations because

13   that doesn't happen until numerous searches occur with regard

14   to the drug trafficking investigation, which is unrelated to

15   Mr. Hunt as victim in the shooting.  But it seemed to me that

16   would you have had probable cause at the outset?  And I think

17   I'm understanding your argument that you wouldn't, really,

18   because you wouldn't have obtained a warrant until a number of

19   things had happened suggesting that the 2017 phone would have

20   information about drug -- was likely to have evidence of drug

21   trafficking from back in 2017.

22        So it's not -- really, I'm asking for clarification on

23   your part about whether we know when the officers discovered it

24   was Mr. Hunt's phone and whether you had probable cause earlier

25   to search that phone for drug trafficking.

1       MR. SUSSMAN:  Okay.  First, there was no outward

2   indiction at the time the phone was seized who the phone

3   belonged to.  I think it's reasonable for the officers in

4   Eugene to assume that it had some connection to the shooting

5   because it was found at the shooting scene amongst spent

6   cartridges, among bullet fragments, among bullet holes, and

7   among blood stains.  But there's no outward indication on the

8   phone who the phone belonged to, and nobody laid claim to it

9   for years.

10      Now, could that phone have belonged to Dontae Hunt?  It

11  could have.  Could it have belonged to the shooter?  It could

12  have.  Could it have belonged to somebody completely

13  unconnected to this case?  Could have.  Nobody knew at that

14  point.  In fact, nobody knew conclusively who that phone

15  belonged to until they actually searched the contents and were

16  able to attribute it to Mr. Hunt.

17      Now --

18      THE COURT:  Does that matter in analyzing whether or

19  not there's unreasonable delay?

20      MR. SUSSMAN:  I think it does matter, to a certain

21  extent, because if, for example, they knew for a fact, going

22  into it, that it was Mr. Hunt's phone, then it might be a

23  little bit -- it might make a difference; but when they don't

24  know who the phone belongs to and there's nothing to attribute

25  it to anybody and no one lays claim to it, then it's -- then it

1    presents a different picture, and it presents a different

2    analysis for the Court's reasonableness and diligence analysis.

3         Now, in terms of when they developed probable cause to

4    search the phone and could they have developed probable cause

5    earlier?  Well, I don't think they could have.  And the reason

6    for that is, is that because the officers were aware -- the

7    agents were aware that Dontae Hunt had been shot, and they were

8    aware of that in connection with their work in the drug

9    investigation.  They knew there had been a shooting.  They knew

10   Mr. Hunt had been shot.  But it wasn't until quite late in the

11   investigation that they discovered that there might actually be

12   some connection between the phones that were seized the night

13   of the shooting and the federal drug investigation, which was

14   completely separate from the shooting investigation, done by

15   completely different agencies, connected with completely

16   different sovereigns.  And there just was nothing to link the

17   phones or anything that could be found on the phones to the

18   federal drug investigation until they had served the search

19   warrants at the residences, seized the 10 or 11 cell phones,

20   subsequently got warrants for those phones, got into the

21   phones, found evidence in the phones, and especially the search

22   warrant that occurred in mid- to late-December of 2019, which

23   is when they found text messages evidencing drug trafficking

24   activities that dated back to January 2018, shortly after the

25   shooting, that they had probable cause to believe that there

1    could be evidence on the phones seized the night of the

2    shooting that tied into the federal drug investigation.

3        So that's a long way of saying, no, I don't think they

4    could have developed probable cause before that.

5            THE COURT:  So when you make the argument in your

6    briefing that there's really zero delay or any delay which

7    would -- you're not saying it's unreasonable, but any delay as

8    between actually obtaining the search warrant and then the

9    forensic analysis, but that's also accounted for by the

10   magistrate judge in giving you that time to do a forensic

11   analysis.

12       So from the Government's perspective, there is zero

13   delay -- or am I understanding that's your position -- that

14   there's zero delay between the December 2, 2017, shooting of

15   Mr. Hunt and the execution of the search warrant, or is

16   there -- are there periods of --

17           MR. SUSSMAN:  It's a little more nuanced than that.

18   I mean, obviously, if we're talking about the time period

19   between December of 2017 and January of 2020, there's a period

20   of time that's elapsed there.

21       The question is going to become as to whom is that time

22   attributable?  Is it attributable to federal agents, who had

23   actually no role in the state shooting investigation down in

24   Eugene, or is it attributable solely to the officers involved

25   in the Eugene investigation?

1          The Government's argument about zero delay was that there
2     was, in fact, zero delay between the time the agents obtained
3     the search warrant and the time the agents executed the federal
4     search warrant on those two phones because the warrant was
5     issued on January 9 of 2020 and executed the same day when the
6     agent seized the phone from the Eugene police.
7          There could be some small period of delay between when
8     they determined that they had probable cause and when they
9     actually obtained the warrant, but there we're talking about
10    maybe a matter of a week or maybe a matter of a week and a half
11    between -- I'm not sure the exact date that they got the --
12    that they did their analysis of the forensics from the phone,
13    that -- that they served the search warrant on back in December
14    of 2019.  I'm not sure how long it took them between the time
15    they served that search warrant and the time they got the data
16    back, but it's not going to be very much time between then and
17    when they realized they had probable cause and got the warrant
18    for the two Eugene phones and executed it.
19              THE COURT:  And because the search warrant that --
20    December 13, 2019, at least according to your briefing, is when
21    officers discovered that there were texts dating back to
22    January of 2018, involving Mr. Hunt and drug trafficking -- or
23    apparent drug trafficking -- and based on that, the officers
24    had probable cause to then search phones that would have been
25    around in December of 2017, and that search warrant was issued

1    on January 9, 2020 -- or they obtained the search warrant

2    January 9, 2020, for the 2017 phone that was on the ground

3    where Mr. Hunt was shot.

4              MR. SUSSMAN:  Correct.

5              THE COURT:  So there's some period of time, but not

6    particularly long, and the question is --

7              MR. SUSSMAN:  Not unreasonably long under the Fourth

8    Amendment.

9              THE COURT:  Then let me ask a question of the

10   defense.

11       Ms. Thibeault, I did notice that you include the property

12   receipt in your briefing, and one of the items that I thought

13   was sort of interesting is number 17, which shows that one of

14   the two sets of keys that were discovered at the scene were

15   released to special -- I think it's Office -- Officer Hart to

16   give to an acquaintance of the victim.

17       Doesn't that suggest that the victim or victim's

18   associates knew that police had -- Eugene police had picked up

19   items from the scene and if they wanted to lay claim to them,

20   they could?

21              MS. THIBEAULT:  I would say that the fact that the

22   Eugene police released keys to associates of Mr. Hunt and not

23   other items, in fact, raises the defense's argument.  Because

24   here we have the Eugene police releasing certain items that

25   they located on scene to associates of Mr. Hunt but not the

1    phone.

2        They never released the phone, obviously, because that's

3    the subject of this motion, to Mr. Hunt or his associates.  And

4    the Government has provided zero evidence, nor can they, that

5    Mr. Hunt or his associates were told about the phone.

6        So the fact that the law enforcement agency investigating

7    this crime releases one item located, I would say, to a

8    reasonable person, would indicate that they did not locate any

9    other items on scene that could belong to Mr. Hunt.

10        Because the reality is that at the shooting, between the

11    time the shooting occurred and between the time property was

12    seized, investigated, discovered, anyone could have picked up

13    those items on scene.  The assailant who almost murdered

14    Mr. Hunt could have taken his phone.  Any of the passing-by

15    witnesses in that apartment complex could have taken his phone.

16    So the fact that the Eugene police provided one item to

17    Mr. Hunt's associates, I would suggest, makes it even less

18    likely that Mr. Hunt would have any idea that the Eugene police

19    seized his phone.

20        And if Your Honor is willing, I would like to address the

21    point that you were talking to the Government about in terms of

22    the timing of probable cause.

23            THE COURT:  Sure.

24            MS. THIBEAULT:  If that's okay.

25            THE COURT:  I assume that's really part of your

1    argument anyway.

2                    MS. THIBEAULT:  Yes.

3                    THE COURT:  So why don't you wait.  Just sit tight on

4    that because then you'll be able to address all of that in your

5    argument.

6                    MS. THIBEAULT:  Sure.

7                    THE COURT:  Although, again, I guess my point, when I

8    look at the property receipt and the fact that an item was laid

9    claim to, isn't it equally plausible that the appropriate

10   inference from that is -- I mean, the police aren't just going

11   to give away stuff to people who don't say, "That's mine," and

12   prove that it's theirs.  Right?  And here we have two sets of

13   keys, a bunch of stuff that's in a planter, bullet casings,

14   really crime scene evidence, that it makes sense that the

15   police -- Eugene police, investigating the shooting, picked

16   everything up.

17        The question is what should they do with it?  Should

18   they -- it looks like somebody -- an acquaintance of Mr. Hunt's

19   must have come and said, "We're going to bring these keys," or

20   they -- somehow that connection to Mr. Hunt was made, but there

21   are other keys that do not appear to have been turned over to

22   anybody.  Mr. Hunt had a phone on him in the hospital; so the

23   phone that is seen in the surveillance could have been the one

24   that he had in the hospital.  So I'm not sure what would

25   have -- what you think would have alerted the police to somehow

1   give that phone to Mr. -- that they had an obligation to give

2   that phone to Mr. Hunt without anybody coming forward.

3               MS. THIBEAULT:  Sure.

4               THE COURT:  Is there any legal authority for your

5   position that they had such an obligation?

6               MS. THIBEAULT:  Sure.  And, first, what I'll note is

7   this evidence receipt doesn't indicate that Mr. Hunt's

8   associates came and laid claim to the keys on scene.

9         What this evidence receipt indicates is that at a certain

10  point law enforcement handed over keys to Mr. Hunt's

11  associates.  There's no indication that Mr. Hunt's associates,

12  from that receipt, or Mr. Hunt himself came up to the Eugene

13  Police Department and said, "Hey, can we have our keys back?

14  Can we have this back?"  The receipt indicates that the Eugene

15  police made a choice by themselves to release the keys and not

16  anything else.

17              THE COURT:  But doesn't common sense tell you that

18  somebody established that those were Mr. Hunt's keys to the

19  police in order for the police to give them over?

20              MS. THIBEAULT:  Sure.  I would say that's one

21  inference.

22        I would say the other inference is that the police decided

23  what they were going to release from the scene based on the

24  information that they had at the time, and this sort of ties

25  into the timing issue that I know I'll address later.

1          THE COURT:  Okay.  So, actually, why don't I now let

2     you argue.  That was one of the questions that I had raised

3     from -- or that was raised in my mind from reading your

4     briefing, but now you're free to argue anything else you would

5     like to highlight in your briefing.  Obviously, I have been

6     able to read what you have submitted, and so you don't need to

7     repeat everything, but I'm happy to have you highlight and

8     argue anything you would like.

9          MS. THIBEAULT:  Sure.  Thank you, Judge.

10         So the first thing I want to do before I get into my

11    outline is specifically address the questions that you had for

12    the Government and their response in terms of probable cause.

13    And what I want to note is on page 7 of their own response to

14    the defendant's motion to suppress, they lay out the timeline

15    about when they became aware that the phone in the Eugene

16    investigation was something that they were going to want in

17    this federal investigation against Mr. Hunt.  And it notes that

18    a warrant executed on a hunt -- on a house they believe to be

19    Mr. Hunt's home on September 27, 2018, under defendant's bed,

20    investigators found a black gun box marked with a make, model,

21    and serial number of one of the guns that Eugene police found

22    in the car with Jones and Thomas after the two women dropped

23    defendant off at the hospital.  And then they also found a

24    receipt that they're going to use in this case.

25         So starting back on September 27th of 2018, the Government

1  becomes well aware that the fruits of the Eugene investigation

2  are something they are going to want in their own investigation

3  against Mr. Hunt.

4      And I'll also note the searches of the phones in this case

5  took place on January 14, 2019, and a subsequent search of a

6  flip phone took place on June 17th of 2019.

7      So what I'm going to ask Your Honor to do ultimately is to

8  have the Government establish what date they're talking about

9  here because I'll note in the declarations the exhibits that

10  they filed in support of their motions, they say, "We were

11  aware of the Eugene investigation.  We knew the stuff was going

12  on.  We believe it connected Mr. Hunt to this case," but for

13  whatever reason, that exhibit very specifically chooses to

14  exclude the specific date that the Government believes that

15  they now want to go seize the phone associated in this case.

16      And their exhibit and their motion specifically excludes

17  the day that they became aware that there were phones that were

18  not searched by the Eugene police, and that's the calculus that

19  we're really going to have to talk about in this case because,

20  per the cases under the Fourth Amendment, every single day,

21  week counts in terms of whether or not the delay in seizing and

22  reviewing this phone under a warrant is reasonable, and so --

23          THE COURT:  Don't all the cases that you cite

24  demonstrate that it's not -- the property is not an unknown

25  person's property?

1          MS. THIBEAULT:  I take your question to mean don't

2    the cases that I have -- don't the cases that we have cited

3    relate to cases where they specifically know that phone belongs

4    to X person?  Am I understanding your --

5          THE COURT:  That's a better way to put it.

6          MS. THIBEAULT:  Okay.  I think your way was better,

7    but at least I got there.

8       So what I'll say is, yes, that's correct.  I don't have a

9    case to bring to you, and if I did, I would love to.  I don't

10   have a case to bring to you where we have an object that the

11   Government doesn't know who it belongs to.

12      So, you know, that's kind of the thrust of the defense

13   argument here is that it's the Government's burden to establish

14   that the delay is reasonable.  And in doing so, they need to

15   specifically establish what delay that was, and their exhibit

16   and their motion don't specifically give that date.  And we

17   have a variety of other dates that suggest that they were well

18   aware of the Eugene shooting, the phones not being searched.

19   And in the exhibit, you know, law enforcement specifically

20   says, "I became aware that the phone had not been searched,"

21   but never included the date that he became aware of that fact.

22          THE COURT:  But what about what Mr. Sussman clarified

23   for me in terms of the development of the probable cause to

24   believe that the phone contained texts or information, evidence

25   regarding drug trafficking activities by Mr. Hunt in 2017?  Do

1    you disagree with -- do you feel there was probable cause for

2    evidence of drug trafficking much earlier than the search was

3    obtained?  So that is after December 13, 2019?

4            MS. THIBEAULT:  Well, I don't want to -- I don't want

5    to kind of circumvent my argument and say that the Government

6    had probable cause, but what I want to suggest is that the

7    Government has the burden of proof in this case, and the

8    exhibit that they're choosing to rely on, on when they found it

9    reasonable to issue a warrant for the phone, specifically

10   leaves out the critical date, which is what date the Federal

11   Government became aware that there was a phone that had not

12   been searched by the Eugene Police Department and the fact that

13   we don't have that information, and it's the Government's

14   burden to prove that information, I think, is the critical

15   question here because --

16           THE COURT:  Are you referring to -- I'm looking at

17   Scott McCollister's affidavit, which is, I think, the evidence

18   of the timeline; right?  That's Exhibit ECF 182-2.

19           MS. THIBEAULT:  Yes.  Specifically, on page 2 --

20   page 2, paragraph 4, "We were aware of the shooting in Eugene,

21   and I included information about it in various warrant

22   affidavits in the federal investigation."

23       So not only was the Federal Government aware of the

24   shooting in Eugene, but they believed that shooting provided

25   them and assisted them in getting probable cause to search

1    other items.

2        So this idea that they can now say, in terms of reaching

3    to get the phone from Eugene, that "These were two totally

4    separate investigations.  They didn't have anything to do with

5    each other.  We didn't believe the shooting could support

6    evidence of drug trafficking," is just not true because they

7    were using the shooting itself as evidence in the warrants to

8    seek search warrants for other digital devices.

9        So it's unclear to me how the Government, on one hand, can

10   say, "Well, we're going to use this Eugene shooting as probable

11   cause in our drug trafficking investigation," and then say "but

12   we didn't have probable cause.  We weren't -- we didn't have

13   any reason to be on notice that this phone was of interest to

14   us," when they were using that shooting throughout the entire

15   time of their investigation.

16       And so what I'll suggest, Judge -- kind of moving into the

17   overview, but --

18            THE COURT:  Can you identify for me where in -- okay.

19   So you're looking at, "We were aware of the shooting, and I

20   included the information about it in various warrant affidavits

21   in the federal investigation"; so you're saying that because --

22   which was a drug investigation.  So if they were including the

23   shooting in the drug investigation, that they should have been

24   able to search the phone at that time?

25            MS. THIBEAULT:  That they would have been on notice

1   that that would have been the time that the phone became of

2   interest to them, if that makes sense.

3            THE COURT:  Okay.  Yeah.  Thank you.

4           MS. THIBEAULT:  So, Judge, on December 2, 2017,

5   Mr. Hunt was a crime victim, and he remains one today.  Eugene

6   police took two of his phones.  One at the hospital, where

7   Mr. Hunt was never told that another phone had been seized from

8   the scene, and when he was told by law enforcement at the

9   hospital that they were going to seize the phone that he had on

10   him at the hospital, he told them he didn't want them to take

11   it.  He invoked his rights.  He exercised his rights.

12            THE COURT:  Let me ask you about that.

13           MS. THIBEAULT:  Sure.

14            THE COURT:  It seemed to me that -- or the

15   Government's response is, "We didn't -- could never encrypt --

16   get through the encryption on the phone" -- the white iPhone at

17   the hospital -- so they have not obtained nor will they use

18   anything from that search.  Is it appropriate for me to -- what

19   outcome should I follow?  It seemed to me one outcome is to

20   deny the motion as moot because no evidence is derived from

21   that.  And that's the purpose of a search warrant, is to

22   suppress evidence; and if there is no evidence from it, it's

23   moot.

24           MS. THIBEAULT:  Sure.  And so I -- I would say as to

25   the search of the white iPhone, to the extent that the

1   Government has not been able to obtain evidence from it today,

2   that the motion could be denied as to that phone as moot.

3            THE COURT:  Okay.

4            MS. THIBEAULT:  If later, of course, technology

5   develops and they're suddenly able to unecrypt it, I would

6   reraise these arguments at that time.

7            THE COURT:  Understood.

8            MS. THIBEAULT:  But I mention the phone at the

9   hospital and that conversation because the Government relies on

10  that in their own response to our motion to suppress as a

11  reason why Mr. Hunt should have known, should have been aware

12  that the Eugene police seized his phone from the scene, because

13  they cite to that scene in their own response to our motion

14  that, "Look, law enforcement had a conversation with Mr. Hunt.

15  They told him they were seizing one phone.  And so, look,

16  Mr. Hunt, as he's lying, bleeding, medicated in a hospital bed,

17  should have been aware that this other phone was probably going

18  to be seized by the Eugene Police Department on scene."

19       Judge, I think this might be an appropriate time, if you

20  are comfortable -- although, I'll play it at your leisure -- we

21  have brought with us an additional exhibit.  I think I labeled

22  it Exhibit 4, but I'm happy to call it whatever the Court

23  wants, which is the body camera footage of that conversation

24  that the officer had with Mr. Hunt.

25            THE COURT:  All right.  Is there any objection to

1   counsel playing that for the Court?

2          MR. SUSSMAN:  No, Your Honor.  Thank you.

3          THE COURT:  All right.  Now is fine.

4          MS. THIBEAULT:  You'll have to forgive me.  I

5   unplugged my computer and dropped the cord.

6          THE COURT:  So the court reporter is not going to

7   transcribe during this portion, if that's okay.

8          MS. THIBEAULT:  I'm fine with that.

9          MR. SUSSMAN:  That's fine, Your Honor.  Thank you.

10     I'm sorry.  Did you call it Exhibit 4?

11         MS. THIBEAULT:  I called it Exhibit 4 because I had

12   labeled my other exhibits in my reply 1, 2, and 3, but I'm

13   happy to call it whatever anybody wants.

14         THE COURT:  Let's keep it 4.  That makes sense.

15         MS. THIBEAULT:  Sure.  With opposing counsel's

16   permission, the video is 7 minutes and 45 seconds long.  I

17   didn't want to edit it because I didn't want anybody to think I

18   was removing anything, but what I would like to do is just play

19   the most pertinent portion, which is the last bit, if that's

20   okay with everybody.

21         MR. SUSSMAN:  Makes sense to us, Your Honor.

22         THE COURT:  That's fine.

23         MS. THIBEAULT:  So at this moment, I'll be playing

24   Defense Exhibit 4, which should be included as an exhibit in

25   our reply, and I will play it, and then I will move to admit it

1    once I --

2            MR. SUSSMAN:  Your Honor, if she's going to play it,

3    it probably should be admitted before it gets played.

4            MS. THIBEAULT:  I will move to admit Exhibit No. 4.

5            THE COURT:  Any objection?

6            MR. SUSSMAN:  No, Your Honor.  Thank you.

7            THE COURT:  Exhibit 4 will be received.

8        (Exhibit 4 played for the judge beginning at 5:23.)

9            MS. THIBEAULT:  Judge, that's Defense Exhibit 4, and

10   I played that because, you know, the central issue that we're

11   talking about -- well, I think there are three main issues that

12   we're talking about here.  Number one, whether or not

13   Mr. Hunt's lack -- momentary lack of control of his phone, as

14   he was fleeing being shot at the scene, constitutes

15   abandonment.  I think the second issue that we're circling

16   around with abandonment is whether or not Mr. Hunt's failure to

17   seek the return of his phone from the Eugene Police Department

18   is further evidence of that abandonment.

19       And as to that, the Government relies on this very

20   conversation that we just watched in the hospital.  And I think

21   it's pretty clear from the video that Mr. Hunt is incredibly

22   injured.  He's not doing well.  We know a doctor says he's

23   probably -- may need surgery, and we know the only conversation

24   that law enforcement had with Mr. Hunt about objects that they

25   were seizing at the time was the phone that he had on him at

1    the time.

2          And when he was asked to cooperate with that

3    investigation, to waive his privacy interests as to that phone,

4    Mr. Hunt says, no, he's not going to give up his cell phone

5    password, and that's the information that Mr. Hunt was given,

6    that the Government can prove about the objects on the scene at

7    the Eugene shooting.

8          And what we also know from this investigation is that

9    Mr. Hunt was on the phone when he was shot.  And so as to the

10   first argument, Judge, I don't -- I don't want to get too far

11   into whether or not Mr. Hunt's dropping the phone at the scene,

12   while he's fleeing being shot, constitutes abandonment.

13   Because, quite honestly, I think the murkier issues are in

14   other places in my motion.

15         But just briefly, I'll note that abandonment needs to be

16   voluntary, and it needs to indicate an intentional

17   relinquishment of somebody's rights.

18         And here we have someone who literally was fleeing being

19   shot and almost being murdered, and so this idea that any kind

20   of momentary lapse of physical control or dropping an object at

21   the scene would constitute voluntary abandonment, I think -- I

22   think short-sights what the Fourth Amendment is really about,

23   which is --

24              THE COURT:  But isn't the black phone -- so he has

25   the phone on him.

1          MS. THIBEAULT:  In a pocket of his pants.

2          THE COURT:  Most people have a single phone, and the

3   other -- the black iPhone is in a planter, which, when you look

4   at -- it's unclear exactly -- so, I mean, although you're

5   saying he dropped it and that somehow that might have been the

6   phone he was on, that's not clear from the video.  And the

7   officers -- so their perception, which was, "We couldn't tell

8   what color the phone was that he was talking on when he was

9   shot," and you -- I couldn't see in the video that the phone is

10  dropped, or at least -- I guess I didn't see the full video.  I

11  saw the stills that were presented in the pleadings.  So if

12  there's a phone in a planter nearby, how do you draw the

13  inference that it's somehow just inadvertently dropped?

14         MS. THIBEAULT:  Sure.  And what I'll say is that's

15  one plausible inference.  Mr. Hunt was being shot.  He was on

16  the phone.  He was running from the scene.  The Government is

17  asking you to draw a different inference, which is that it was

18  purposely left there.  And to that point, it's the Government's

19  burden to prove that he voluntarily abandoned it, and they're

20  supposed to prove it by a preponderance of the evidence.  And

21  the very fact we're having this discussion, you and I, about

22  what evidence there suggests that he voluntarily abandoned it,

23  and, "Couldn't this be another reasonable inference, and

24  couldn't this be another be reasonable inference?" well, that

25  right there should tell Your Honor that the Government hasn't

1   met its burden and cannot meet its burden in terms of whether

2   or not that phone being left at the scene constitutes voluntary

3   abandonment.

4        I think the -- I think, honestly, the bigger issue that

5   we're dealing with here and that Your Honor has already kind of

6   peppered us with questions about is what obligations does the

7   Government have to kind of -- to put someone on notice about,

8   "Hey, we -- we have your property"?

9        And I think that was Your Honor's most pointed question

10  about, you know, "Aren't these cases that you've cited all

11  about property that they know who it belongs to?"  And like I

12  said earlier, I wish I had a different case, but I don't.

13       And so what I think we need to look at in that

14  circumstance, given -- given the unique factual circumstance

15  that we have here, is does Mr. Hunt's failure to seek the phone

16  back constitute abandonment?  And I think the first answer to

17  that question is, number one, that is on the Government to

18  prove.

19       And so if the Government has the burden of proving

20  voluntary abandonment, which constitutes an intentional

21  relinquishment of someone's rights, well, the first relevant

22  question would be, "Did Mr. Hunt -- was he ever aware that that

23  phone was taken by the Government?"

24       And we talked a little bit about this earlier with the

25  evidence receipt, and the Government has provided zero evidence

1    that Mr. Hunt was ever put on notice that his phone was taken

2    by the Government.

3        There were tons of people on -- tons is hyperbole.

4    Apologies.   There were other people on scene, including the

5    person who shot Mr. Hunt, who could have seized his phone.

6    There were other witnesses on scene who to have seized his

7    phone.

8        And Eugene Police Department, if they thought it could

9    have been Mr. Hunt's phone, could have said, "Hey, we found

10   another phone on scene.  Is this yours?"  And they didn't.  And

11   that failure to do a proper investigation or to attempt to put

12   Mr. Hunt on notice that it -- "Hey, that might be your phone on

13   scene," shouldn't be held against Mr. Hunt.  Especially when

14   it's the Government's burden here to prove voluntary

15   abandonment.

16           THE COURT:  And is it fair to say, though, there

17   was -- Rylie Jones and then the defendant's girlfriend were

18   both in the same vicinity --

19           MS. THIBEAULT:  Yes.

20           THE COURT:  -- as Mr. Jones -- excuse me -- as

21   Mr. Hunt?

22           MS. THIBEAULT:  Not when he was -- not -- I think

23   "vicinity" might be -- I think maybe I'm having an issue with a

24   word.

25           THE COURT:  They come through that area to help him?

1          MS. THIBEAULT:  Yes.  Yes.  That would be a fair

2     statement, Judge, is that Mr. Hunt is shot.  He's trying to get

3     away from the scene.  Those two women come and try and assist

4     him as he's leaving.  That's correct.

5          THE COURT:  Your view, Ms. Thibeault, would it be a

6     search if the officers turned on a phone they found to see if

7     they could identify anything on it that would place it with a

8     particular owner?

9          MS. THIBEAULT:  I had not thought about that question

10    before you just asked me, but thinking on my feet, what I would

11    say is that, when we're wondering whether or not a search

12    occurs, what we're wondering is whether or not the Government

13    or Government entity is examining an object more than they

14    would be able to with a plain eye.  So what I would say is if a

15    phone is lying on the ground and it's -- and it's off but if

16    turned on -- and you can just see what is on the face of the

17    screen -- which, you know, if I had my iPhone turned on, I

18    could pick it up, and whatever is on that face of the screen,

19    when you can see it's on, I think that's fair game.  I think

20    what wouldn't be fair game, then, would be to go into the

21    phone, if that's making sense.

22         THE COURT:  So they could touch the face of it to get

23    it to turn on, though?

24         MS. THIBEAULT:  I -- not examining the case law on

25    this issue and just thinking on my feet, I would say that's

1   probably fair.  Because when we're out in public, if anybody is
2   on this type of iPhone, you know, the public can see what is on
3   the screen of your iPhone.
4            THE COURT:  So plain view?
5            MS. THIBEAULT:  Sure.  Yeah, but not having examined
6   the case law on that very specific issue.
7       And so when the Government is required to prove by a
8   preponderance of the evidence that Mr. Hunt voluntarily
9   abandoned his rights to the phone, one of the factors that
10  Your Honor should be looking at is what evidence Mr. Hunt had
11  that the Government had his phone.
12      And so far, all I can gather from the Government's motion
13  is that Mr. Hunt should have known that the Eugene police could
14  have had his phone because of the conversation they had had at
15  the hospital, which is why I admitted Exhibit 4, so Your Honor
16  could understand the full scope of that, and also that bit of
17  evidence receipt that we have already been discussing.
18           THE COURT:  But doesn't that video that you showed as
19  Exhibit 4 clearly show Mr. Hunt even knows the officer who
20  takes his phone?  So had he believed that there were other
21  items from the scene taken by the Eugene Police Department, he
22  knew it was Eugene Police Department.  He knew they were
23  investigating the potential homicide or -- or attempted
24  homicide, and he knew the officer.
25           MS. THIBEAULT:  I would agree with you that he knows

29

1    the Eugene police is investigating the shooting and to him and,

2    arguably, would be familiar with the face of the officer.  I

3    don't want to concede that Mr. Hunt, you know, as he's lying

4    there kind of highly medicated presurgery, is going to remember

5    that officer's name.  But, sure, I think it's a fair assumption

6    that we can all agree that at the time Mr. Hunt was in that

7    hospital that he knew Eugene police were investigating what

8    happened.

9        I think kind of what we're all arguing about is what to

10   make of that.  And what I will, again, point to is that it's

11   the Government's burden to prove that voluntary abandonment

12   occurred, and here we have multiple different inferences that

13   could occur from the circumstance.

14        THE COURT:  How, as part of standing, your client has

15   to demonstrate possessory interest in something, is there -- is

16   it your position that there's no obligation whatsoever to --

17   for an individual to assert that they own something, that it's

18   theirs, even in a two-year period, to -- in order to have

19   standing to challenge it?

20        MS. THIBEAULT:  Sure.

21        THE COURT:  At what point does it become abandoned

22   when they know something is there and they don't do anything

23   about it, or -- or it's never -- it's always the obligation of

24   the police?

25        MS. THIBEAULT:  Sure.  This is what we're all

1    hovering around; right?  Your Honor just asked me the central

2    question.  So the answer that I'm going to give you, the rule

3    of law that I want you to take from this is that as part of

4    proving abandonment, the Government would need to prove by a

5    preponderance of the evidence that Mr. Hunt was on notice that

6    that object had been taken by police.

7         And here we have multiple different conflicting inferences

8    that could be made.  Mr. Hunt is in the hospital.  Police tell

9    him, "Hey, we're going to seize this phone you have here."  To

10   a reasonable person in Mr. Hunt's position, that might indicate

11   they didn't take anything else.  "They are not going to ask me

12   about anything else.  Here they asked me about whether or not

13   I'm going to consent to a search of the phone.  They didn't ask

14   me to consent to a search of the phone on scene."  I guess the

15   Government doesn't have that.  Right?  That's one reasonable

16   inference.

17           THE COURT:  Why is that even reasonable, though?  It

18   seems like he knows that they have -- they are investigating a

19   crime scene; so if something is missing, who else would have

20   taken it?

21           MS. THIBEAULT:  The person who shot Mr. Hunt.  The

22   Government's theory is that -- and they're trying to use the

23   shooting as part of their case against Mr. Hunt -- is that the

24   shooting was drug-related.  And so the person who shot Mr. Hunt

25   may very well have wanted that phone because that phone might

1  have connected the shooter to the crime.  So that's one

2  inference of who could have picked it up.

3     Another inference of who might have picked it up is maybe

4  Mr. Hunt thought the other two women who were with him on scene

5  had that object, found out later they didn't, didn't know who

6  had it.

7     I -- I want to be clear that the defense's position is not

8  that there -- there is no inference that could exist that the

9  Eugene Police Department had seized the phone.  I agree with

10  Your Honor.  I think it would be kind of unfair for me to say

11  that that's not an inference that could be drawn here, but the

12  fact that that is one inference, among many, is the defense's

13  central argument here, and that it is the Government's burden

14  to prove by a preponderance of the evidence that the

15  relinquishment was voluntary.

16     And I'm going to suggest here, Your Honor, that that means

17  that Mr. Hunt had to be on some kind of notice that the Eugene

18  Police Department had that phone, and I think even though that

19  is one potential inference, it's one potential inference among

20  many.

21     The fact that when Mr. Hunt was told, "We're going to

22  seize the phone from you at the hospital.  Do you want to give

23  us your password?" and invokes his right to say "No," I would

24  say another potential inference that we can draw from that

25  video is that, if Mr. Hunt had known they were going to search

1    his phone, he could have told them "No."  Because this is a man

2    we know who, when they seized his phone, said, "No, I don't

3    want you to go through it."  And so what I will say is, given

4    the fact that there are multiple competing inferences and the

5    Government has the burden here, that we just can't get to a

6    preponderance of the evidence.

7        I think the other issue that Your Honor has focused on --

8    I addressed earlier on, in terms of the timing, that the

9    Government had been using this Eugene shooting all along in

10   their search warrants on this federal case, and my -- my

11   question to you -- my ask of you was to hold the Government to

12   what date that phone really became of interest to them.

13       And what I want to focus on too is that the Fourth

14   Amendment -- the exclusionary rule's sole purpose is to deter

15   Fourth Amendment violations, and so I -- hypothetically, if we

16   imagine a scenario -- I hope the Government would agree with me

17   on this.  Let's just imagine the Eugene Police Department

18   seizes the phone.  They wait the 700 days.  And then the Eugene

19   Police Department decides to get a search warrant for that same

20   phone.  Abandonment issues aside, just putting that issue

21   aside, I would hope that we would all agree that under the

22   Fourth Amendment case law that delay is unreasonable.

23       And here the Fourth Amendment is broader than just

24   deterring one sovereign and then another sovereign and then

25   another sovereign.  The sole purpose of the exclusionary rule

1   is to deter Fourth Amendment violations.  And here, under the

2   Government's theory, even if the Eugene Police Department had

3   violated Mr. Hunt's rights, that the Federal Government can

4   come -- can just come in at the tail end and ignore all of

5   those previous violations because they are a separate

6   sovereign.  I don't think the exclusionary rule is that narrow.

7   I don't think the Fourth Amendment is that narrow.

8        I think the Fourth Amendment and the exclusionary rule's

9   general purpose is to deter Government misconduct.  And in this

10  case the Federal Government, especially given the fact that

11  they were relying on that very same shooting to investigate

12  Mr. Hunt in this case, can't just wash their hands of the

13  other -- the Eugene Police Department's Fourth Amendment

14  issues.

15       So, Judge, at the end of the day, I'm going to ask you to

16  find that the Government has not met its burden to show that

17  Mr. Hunt voluntarily abandoned his phone and that the delay in

18  the Federal Government realizing the phone was an interest and

19  then seeking a search warrant was unreasonable under the Fourth

20  Amendment.

21       Thank you.

22            THE COURT:  Thank you.

23       Mr. Sussman?

24            MR. SUSSMAN:  Well, Your Honor, it appears that

25  Mr. Hunt's arguments for suppression have evolved somewhat over

1    time since he filed his original motion.  In his original

2    motion, he said that the police unlawfully seized both phones

3    without a warrant, without justification, without his consent,

4    and he claims in his original motion that the police told him

5    they were seizing both phones, because this was a very serious

6    crime.

7         Now, we know now that that, in fact, was false, that

8    that's not what happened, and that that's neither supported by

9    the facts nor the law.  Because as you saw in the video -- and,

10   by the way, just for the record, the video was the body cam

11   worn by Officer Stropko -- S-t-r-o-p-k-o -- who was the officer

12   that contacted Mr. Hunt in the hospital.

13        We know that he referenced only the one phone that was

14   seized from Mr. Hunt's person.  Only one phone was seized from

15   Mr. Hunt or from his belongings, and that was the white iPhone.

16        The black iPhone wasn't anywhere near there.  It wasn't

17   seized at the hospital.  It wasn't seized from Mr. Hunt.  It

18   wasn't seized from Mr. Hunt's belongings.  It was found in a

19   bed of bark dust in the parking area of an apartment complex,

20   out in the open, in plain view, in an area where a shooting had

21   occurred.  That is where the black iPhone was seized.

22        So to the extent Mr. Hunt tells you in his original motion

23   that that phone was seized unlawfully, that is just flat wrong

24   because that phone was found by the police at a shooting scene

25   next to a bunch of spent cartridges, near blood stains, near

1    bullet fragments, near bullet holes, in an open area in a bed

2    of bark dust in plain view.

3        There was absolutely nothing unlawful about the seizure of

4    the black iPhone.

5        The only question really is whether the search of the

6    iPhone was reasonable under the Fourth Amendment.  And before

7    we get to that, the first thing that has to happen is that

8    Mr. Hunt has to demonstrate that he has an expectation of

9    privacy in the contents of that phone.  That's what -- the

10   whole thing comes down to timing here; right?  Well, not the

11   whole thing, but one of the issues comes down to timing

12   because, really, there's no question that the phone was

13   searched, the black iPhone, personally, to a facially valid

14   federal search warrant.  And Mr. Hunt does not claim in this

15   motion that that warrant was unsupported by probable cause, nor

16   can he, because he raised that claim before and it was already

17   rejected by Judge Mosman during the first round of suppression

18   motions.

19       So really what he's saying is, is that the Government just

20   waited too long to search it.  But before he could raise that

21   argument, he has to demonstrate that he still has an

22   expectation of privacy in the phone, and he can't do that here

23   because he abandoned it.

24       Now, he clearly had an expectation of privacy in the white

25   iPhone because, I mean, it was seized from his belongings that

 1   went with him to the hospital, and the officer told him he was

 2   seizing it, and Mr. Hunt did not consent to it being seized or

 3   searched and would not provide consent -- or would not provide

 4   the passcode for the phone.

 5        So he clearly had an expectation of privacy in the white

 6   iPhone, and he had clearly asserted that expectation of

 7   privacy.  But, again, the white iPhone was never actually

 8   searched.  Well, they tried, but they couldn't extract anything

 9   from it; so there's nothing to suppress there.

10        THE COURT:  So do you agree with my assessment that

11   it should be denied as moot?

12        MR. SUSSMAN:  Absolutely.

13        I also concur that, if technology develops somehow so that

14   they can eventually bypass the encryption between now and the

15   current trial setting and if we get data, then, of course, they

16   would be free to reraise that if we find anything of any value

17   on there.  But, frankly, I don't think that's going to happen.

18        So set aside the white iPhone for now because the white

19   iPhone -- really the motion to suppress the white iPhone is

20   moot.  There's just nothing to suppress.

21        Now, the black iPhone -- it wasn't seized from Mr. Hunt's

22   person or from his belongings or from anywhere near where he

23   was at the time.  It was found in an open area at a shooting

24   scene, and he was the victim, not the suspect, not the target

25   of an investigation.  He was the victim.  When they looked at

1   that iPhone, they had no idea who it belonged to.  It was just

2   an iPhone sitting in the bark dust.

3        And to the extent that Ms. Thibeault was saying to you,

4   "Oh, they could have picked it up and turned it on and looked

5   into it," if they had done that and found one shred of evidence

6   in there, you bet that they would be screaming that that was an

7   unlawful search.  So the fact the iPhone was sitting there, I

8   don't think they had the authority to turn it on and look into

9   it.

10            THE COURT:  Where does it say in your exhibits that

11   the officers had no idea whose phone it was?

12            MR. SUSSMAN:  What exhibit are you referring to?

13            THE COURT:  Any exhibit.  What's the evidence of

14   that?

15            MR. SUSSMAN:  Well, there's just no evidence that

16   they knew who it did belong to.  I mean, it's an iPhone sitting

17   on the ground.  I mean, here is an iPhone --

18            THE COURT:  I understand.

19            MR. SUSSMAN:  -- sitting on the ground.

20            THE COURT:  From the circumstances here, how do I

21   need to find that -- or do I need to find that what you're

22   saying is based on any part of the record?

23            MR. SUSSMAN:  Do you need a specific item that you

24   can point to to say the officers didn't know, when they looked

25   at it, that they didn't know, as they looked at it, who the

1    phone belonged to?

2             THE COURT:  Well, what's the evidence that you're

3    relying on that you submitted in support of your response that

4    tells me what you've just argued orally?

5             MR. SUSSMAN:  That they didn't know who the phone

6    belonged to?

7             THE COURT:  Yeah.  So where do I get that from the

8    evidence?  Because I --

9             MR. SUSSMAN:  Well, you can look at the property

10   receipt that the defendant submitted, which was the property

11   receipt for the items seized from the shooting scene by the

12   police, and you'll notice that nowhere on there does it

13   attribute anything found there to Dontae Hunt or to any other

14   specific individual.  The only thing on that receipt is the

15   offense that they're investigating, which was assault in the

16   first degree.

17            THE COURT:  And then there's the reference to the

18   keys are turned over by Officer Hart to an acquaintance of the

19   victim?

20            MR. SUSSMAN:  Correct.

21            THE COURT:  So one of the items is attributed to a

22   person, and that is the defendant?

23            MR. SUSSMAN:  But not an item that is the subject of

24   the motion to suppress.

25            THE COURT:  Understood.  But it's not -- you know,

1   we're not talking in a vacuum here.  So one of the items is

2   attributable, and I'm just trying to see how I can clearly

3   infer from the declaration that you have presented as evidence

4   what you're saying, which is they had no idea whose phone it

5   belonged to or what pieces of evidence tell me that that's

6   right?

7              MR. SUSSMAN:  Well, another way to look at that would

8   be what evidence is there that they believed or knew that that

9   phone belonged to Dontae Hunt, and the answer is there's no

10   evidence of that either.  The only inference you can draw from

11   that is nobody knew who the phone belonged to.  There's no

12   evidence that anybody knew who the phone did or did not belong

13   to.

14              THE COURT:  Whose burden is it to establish that?

15              MR. SUSSMAN:  To establish their knowledge of who the

16   phone belonged to?

17              THE COURT:  Their lack of knowledge.

18       Your theory depends on they didn't know whose it was and

19   that the defendant had an obligation to do something to --

20   because under the circumstances -- so you say it was in a

21   bed -- it was found in a --

22              MR. SUSSMAN:  A bed of bark dust.

23              THE COURT:  In the bark dust.  Where does that come

24   from?

25              MR. SUSSMAN:  There's a photograph of that in our

1    response.

2            THE COURT:  Okay.  But you didn't have anyone put it

3    in a declaration?

4            MR. SUSSMAN:  No.  Because I don't -- well, I don't

5    think that the federal agents could testify from their own

6    personal knowledge as to where the phone was found by the

7    Eugene police.

8            THE COURT:  Although it doesn't have to be based on

9    personal knowledge.

10            MR. SUSSMAN:  Well, I'm happy to submit the Eugene

11    police report if you would like that in the record, Your Honor.

12            THE COURT:  I'm just trying to understand what

13    evidence you're basing your statements on.

14            MR. SUSSMAN:  Well, I'm basing my statements on the

15    facts that were contained in the Eugene police reports, and the

16    facts were they found the phone in a bed of bark dust at the

17    shooting scene.

18            THE COURT:  So that -- I didn't see that in your

19    pleading or -- and do I have -- which -- I do have some of the

20    Eugene police report.  So you're talking -- is it Exhibit 187-2

21    to the defense exhibits?  Tell me where you're looking at.  I

22    just want to make sure I know where in the record that the

23    information you're stating -- factual information -- comes

24    from.

25            I'm not sure why that's confusing -- that you have to base

1    your response on evidence in the record.

2            MR. SUSSMAN:  Well, I -- I know that in our response

3    to the motion to suppress we indicate that it was found in the

4    bark dust, and we provide a photograph taken by the police of

5    precisely where it was found.  It's in ER 182, and the

6    photograph appears on page 5.

7            THE COURT:  Okay.

8            MR. SUSSMAN:  And the phone has a big red circle

9    around there for emphasis.  But it shows the bed of bark dust,

10   and it shows the phone lying in the bed of bark dust.  And to

11   the bottom right-hand corner of the picture, you can see blood

12   stains on the pavement.

13           THE COURT:  Okay.  All right.

14           MR. SUSSMAN:  So let me see if I can pick up my train

15   of thought again here.

16       All right.  So in her argument, Ms. Thibeault suggested

17   that it's possible that Mr. Hunt had been talking on that

18   phone, but as the Court pointed out, there's no evidence to

19   support that because we just don't know.  We can't tell from

20   the parking lot surveillance video, which phone he was talking

21   on, whether it was white, whether it was black, or whether it

22   was some other phone.  It could have been that phone or could

23   have been the white iPhone he had in his pocket.  Nobody knows

24   what phone he was talking on when he was shot.

25           And she suggests to you that, oh, he probably just dropped

1    it and forgot about it and walked away and that momentary lapse

2    of control over the phone doesn't equate to abandonment.  And

3    that's probably true if you look at those facts in isolation.

4    But there's more at play here.

5         Because remember that he was also carrying the Gucci

6    satchel that had the two guns in it over his shoulder, and that

7    was dropped as well.

8         And yet in the surveillance video you can see Rylie Jones

9    pick up the satchel, walk it over, and put it into the trunk of

10   the Lexus sedan that they had both arrived in.  And then a few

11   minutes later you see her remove the satchel from the trunk and

12   bring it back, and that satchel went with defendant and Rylie

13   Jones to the hospital.  It remained in the car when he went

14   into the hospital to get treatment.

15        And, of course, he had the white iPhone on his person and

16   in his belongings at the hospital.  So he took that with him as

17   well.

18        He took the white iPhone with him.  He took the Gucci

19   satchel with him.  In fact, that satchel made a trip to the

20   trunk of a car and back again before it went with them to the

21   hospital.  They took him -- he specifically took those things

22   with him, but he left the black iPhone behind.

23            THE COURT:  And is it your position that that

24   evidence shows both that the defendant didn't assert any

25   interest -- it sort of goes to the abandonment that he knew

things were potentially going to be picked up, but he asserts
ownership over the things he wants to assert ownership over but
not the black iPhone.

MR. SUSSMAN:  Correct.  And, importantly, for our
purposes here, he never ever contacted the Eugene police to
assert ownership of that phone or to ask for its return.

Now, of course, today he's telling you, well, the
Government has the burden of proving that he specifically knew
that that phone was in the Eugene police custody before they
can charge him with failing to assert an ownership interest
over it.

And that argument might have some force but for two
important facts.  First, he knew, unequivocally, that the
Eugene police seized the white iPhone because you saw the
video, and the officer told him about it to his face; and yet
he never made any effort to get the white iPhone back either.
And, second, even after he knew that the Eugene police had the
phone because he got -- or because he got those reports in
discovery from the Government and even after he knew that we
had gotten the search warrant, he never asked for the black
iPhone back then either.

He took the white iPhone.  He took the Gucci satchel.  He
left the black iPhone behind.  That's abandonment.  And because
he abandoned that property, he relinquished any expectation of
privacy he had in it.

1      Now, even if Mr. Hunt could show that he retained an
2  expectation of privacy in the black iPhone, he cannot establish
3  that there was a Fourth Amendment violation with respect to its
4  search.  He's trying to attribute to the Federal Government the
5  actions of the Eugene Police Department.  Even though they were
6  separate agencies, from separate sovereigns, involved in
7  completely separate investigations with separate focuses and
8  separate targets.

9      In the Eugene shooting investigation, Dontae Hunt was the
10  victim.  Not a target, not a suspect.  They were trying to
11  figure out who shot Dontae Hunt.

12      The Federal Government played no role whatsoever in that
13  shooting investigation, nor did Eugene take any role in the
14  federal drug investigation.  In fact, the federal drug
15  investigation didn't even start for another seven months, and
16  it began after a person died from an overdose of -- after
17  ingesting a counterfeit oxycodone pill laced with a fentanyl
18  analog.

19      And the investigation was able to trace that back to
20  Dontae Hunt.  And as the investigation continued, of course,
21  the federal investigators became aware that Mr. Hunt had been
22  shot in Eugene, and they put that in their search warrant
23  affidavits, but they had no reason to believe at that point
24  that the shooting in Eugene was directly connected to the drug
25  investigation.  And, in fact, interestingly enough, that was a

1   major bone of contention with the defense attorney who's

2   representing him at the first round of the motions to suppress,

3   where he argued in his pleadings and again at the suppression

4   hearing that the fact that he was shot in Eugene seven months

5   earlier had nothing whatsoever to do with the investigation.

6       So it seems now that this defense team is telling a

7   different tale, saying, "Oh, they should have known right then

8   that it was part of the federal drug investigation," where

9   earlier their predecessor was saying that had nothing

10  whatsoever to do with the federal drug investigation.  They're

11  talking out of both sides of their mouth here.

12      Now, I understand it was a different attorney representing

13  him then, and he may have had a different strategy in mind;

14  but, again, this gets back to the whole theory for suppression

15  seems to be evolving as the case goes on.

16      It wasn't until the drug investigation had progressed that

17  the search warrants at the residences were executed, that the

18  phones were seized, that subsequent search warrants were

19  executed on those phones, and that evidence was derived from

20  those phones toward the middle or the end of December of 2019

21  that the investigators actually had probable cause to believe

22  that the phones seized by Eugene were going to have evidence of

23  the -- pertinent to the federal drug investigation in them.

24      It was a very short time after they had that probable

25  cause determination that they got the federal search warrant

1   and that they searched the phone and that they found the

2   evidence.

3        Now, Ms. Thibeault asks you to hold the federal agents

4   responsible for the delay by the Eugene Police Department.  And

5   she says that the Federal Government shouldn't be able to walk

6   away or clean the slate based on something that the Eugene

7   police did wrong.

8        But, Your Honor, with all due respect, the Ninth Circuit

9   disagrees.  This is a case that I just became aware of this

10  morning, although it's not a new case, but it directly pertains

11  to that point raised by Ms. Thibeault.  And the case is *United*

12  *States v. Basinger*, which is B-a-s-i-n-g-e-r.  It's a Ninth

13  Circuit case.  The citation is 60 F.3d 1400.  It's from 1995.

14       And in that case the Government offered, at trial,

15  evidence of an earlier traffic stop by a different officer from

16  a different agency in a completely unrelated investigation, and

17  the defendant said that should have been excluded because that

18  original traffic stop by that original officer in that other

19  case was done in violation of the Fourth Amendment.

20       And the Ninth Circuit said, citing an earlier case called

21  *United States v. Lopez Martinez*, that unless there's some

22  suggestion of bad faith or collusion by officers involved in

23  the separate investigation and so long as their focus wasn't on

24  the subsequent investigation, which is exactly the case here,

25  then suppression is not warranted.

1    And that holds true here as well.

2    The defendant tells you that, look, there were over 700

3    days that elapsed between the seizure of those phones between

4    the Eugene police and when the federal agents executed the

5    search warrant on them.  But by that -- that count, though,

6    relies on sort of merging together into one big investigative

7    blob things that were done by the different agencies in

8    unrelated investigations, conducted by separate sovereigns.

9    And that rely -- in order to make that argument, she has to

10   convince you that every single day counts from the moment the

11   Eugene police seized the phone.  But I don't think that's a

12   reasonable reading of the Fourth Amendment, and I don't think

13   it's reasonable for you to hold the federal officers

14   accountable for that because, first of all, they weren't

15   involved in the investigation; second, they didn't direct the

16   Eugene police to do that; third, they didn't ask the Eugene

17   police to sit on that stuff; and, fourth, they didn't have

18   anything whatsoever to do with the Eugene investigation.

19   To the extent that the Fourth Amendment's exclusionary

20   rule is designed to deter police conduct -- or police

21   misconduct and to deter future Fourth Amendment violations, we

22   have to ask ourselves, "What is it here?  What is the deterrent

23   value?"  When the federal agents are not involved in the Eugene

24   investigation.  When the federal agents eventually determine,

25   through their ongoing investigative efforts, that those phones

1    could contain evidence pertinent to their investigation and

2    then they promptly get a warrant to search them, where is the

3    conduct to be deterred?  What is the deterrent value there?

4         This is not an instance where the police hold up

5    undelivered U.S. Mail for weeks before getting a search warrant

6    for it, as was the case in *Dass*, that was cited by the defense.

7         And this isn't a case where items were taken from --

8    directly from an individual, and the evidentiary value of those

9    items were immediately apparent, which was the case in

10   *Mitchell*.

11        This is not a case where the Eugene Police Department held

12   onto those phones for two years and then the Eugene Police

13   Department got a warrant to search them for evidence of a

14   two-year-old shooting.  This is a case about a phone that was

15   found in a bed of bark dust at a shooting scene that nobody

16   laid claim to, that nobody asked for the return of, who the

17   owner of which nobody knew at that point.  This is a case in

18   which federal investigators learned of the potential

19   evidentiary value of those phones well into their own

20   investigation sometime later.

21        Now, didn't they know that there was a connection between

22   Dontae Hunt and the shooting back in 2018?  Well, yeah, they

23   did.  Because when they served the search warrant at his

24   residence, they found the box for the gun under his bed.  They

25   found the handwritten receipt to Rylie Jones in his bedroom.

1    So, yeah, they knew there was evidence linking
2  Dontae Hunt's residence with the shooting, but what they didn't
3  know was that there would be anything on those phones that
4  connected the federal drug investigation because those phones
5  were seized in December of 2017.  The federal drug
6  investigation didn't even begin until June of 2018.  And it
7  wasn't until that investigation had run its course that they
8  learned that his drug trafficking activities actually dated
9  back to the time of the shooting and therefore there could be
10  evidence on those phones.

11    THE COURT:  Let me ask you, Mr. Sussman, I can't tell
12  from Scott McCollister's declaration when the federal
13  investigators knew about the Eugene police actually seizing the
14  black iPhone.  I couldn't tell -- I didn't see it in my
15  materials, but does that even matter?  I mean, we talked about
16  development of probable cause, but do I need to know when
17  the -- sort of to the point at which the federal investigators
18  become responsible for Eugene delay?  Is that when the federal
19  investigators know that the iPhone -- black iPhone exists?

20    MR. SUSSMAN:  No, I don't think so.  Because they --
21  you know, they -- they may know that the phone is in evidence.
22  I mean, if they got the reports from the Eugene Police
23  Department, they're going to know that the phone was in
24  evidence.  But the question becomes when did it become of
25  interest to their federal drug investigation?  And the

1    Government's position is not until they had sufficient probable

2    cause to believe there was going to be evidence connected to

3    the federal drug investigation on the phone, and that wasn't

4    until the middle to the very end of December of 2019.

5            That's the pertinent time frame for the Court's Fourth

6    Amendment reasonableness analysis.

7            So, Your Honor, in sum, Mr. Hunt took the white iPhone,

8    took the Gucci bag, left the black iPhone in the bark dust.

9    That's an abandonment.  He no longer had a reasonable

10   expectation of privacy in it.  But even if he could show that

11   he did, the delay attributable to the federal investigators, in

12   getting a warrant to search the phone, just does not rise to

13   the level of unreasonableness under the Fourth Amendment.

14           And for those reasons, Your Honor, defendant's motion to

15   suppress should be denied.

16               THE COURT:  All right.  Thank you.  Any response?

17               MS. THIBEAULT:  Sure, Judge.  I just want to go

18   through a list of points that were just raised by the

19   Government.  So to the extent these are kind of out of temporal

20   order, I apologize.

21           The first thing I want to mention is the Government's

22   citation.  I think it was *Basinger.*  I wrote down the citation.

23   I haven't had the opportunity to peruse the case that they're

24   citing to today, and I don't have internet access; so I can't

25   pull it up.  So what I would ask is to the extent that

1    Your Honor is going to base your ruling on that case, I would

2    ask for an opportunity to respond to that.

3              THE COURT:  Yeah, that's fine.  We've already found

4    that case, but --

5              MS. THIBEAULT:  Great.  Thank you.

6              THE COURT:  Certainly.

7              MS. THIBEAULT:  Okay.  What I will note is -- not

8    having reviewed that case, I will note that, even in the

9    Government's summary of that case just now, it seems like those

10   factually are very different than what we have here.  Because

11   the Government's summary of that case is where the two

12   investigations are completely separate.  I -- I think that's

13   what I heard.

14        And here the Federal Government was using the Eugene

15   shooting for the basis of their probable cause in warrants from

16   essentially the spring 2018 on.

17        So, again, you know, the Government is trying to have it

18   both ways.  They are saying, "Oh, this Eugene shooting is

19   totally separate from our investigation.  Mr. Hunt was a victim

20   in that, and the Federal Government was doing their own thing,"

21   but that's just not true.  The Eugene shooting was part of the

22   search warrants that they had executed as part of Mr. -- as

23   part of the Federal Government's investigation into him.  And

24   so these two investigations were not separate at all.

25        The fact that prior defense counsel was arguing that they

 1    should have been separate is a completely different issue

 2    because here what we're talking about is how the Federal

 3    Government treated these two investigations, not whether they

 4    should have been treated that way.

 5         The issue here is that the Federal Government was not

 6    treating these as separate investigations.  They were using the

 7    Eugene shooting as their probable cause in this case from

 8    essentially early on.  And I want to note specifically on

 9    timing issues, you know, I -- I hear different generic timing

10    about they didn't learn that the phone this probable cause

11    until sometime later and then this mention of a December 2019

12    delay.

13         And two things on that.  In the Government's own motion,

14    page 8, second paragraph, they got search warrants for phones

15    recovered from the defendant's premises in October of 2018, and

16    they got authorization later, on December 13, 2019, for other

17    phones.  So I -- I understand he's referencing that

18    December 13, 2019, date; but they got a search warrant for

19    phones back in October of 2018.

20         And moreover, according to their own motion on page 7, on

21    September 27, 2018, they found connections that they're going

22    to argue connect Mr. Hunt's drug trafficking to the Eugene

23    shooting back on September 27 of 2018.

24              THE COURT:  But isn't the -- the later search warrant

25    that they say connected it to the 2017 -- January of 2017 --

1    2017 drug trafficking, which would provide the probable cause

2    to believe that Mr. Hunt was engaged in drug trafficking in

3    December of 2017?

4              MS. THIBEAULT:  Well, I understand that's what

5    they're --

6              THE COURT:  I said 2018.  Excuse me.  January of 2018

7    and December of 2017.

8              MS. THIBEAULT:  Sure.  I understand that's what

9    they're saying, but they are also seeking to use evidence from

10   the execution of the warrant on September 27, 2018, the

11   evidence that was found under his bed, and they're saying

12   that's part of the Eugene shooting and drug trafficking, and

13   all that evidence was found on September 27th of 2018.  And

14   they plan to use that as evidence in their case-in-chief

15   against Mr. Hunt.

16       So the idea that --

17             THE COURT:  But they're gun charges.

18             MS. THIBEAULT:  Yes.  And it was connected to the

19   Eugene shooting.  So this idea that nothing related to the

20   Eugene shooting really had evidentiary value in connection with

21   drug trafficking, I think is contradicted by that September 27,

22   2018, search warrant execution.

23       And I'll note here -- and again, I want to focus -- I know

24   I keep saying it.  I'll just keep saying it again and again is

25   that it's the Government's burden to establish that Mr. Hunt

1    voluntarily abandoned his privacy interests.

2         And in regards to the delay, it's their burden to

3    establish what delay we're talking about.  And here the

4    declaration from Scott McCollister just says, "We were aware of

5    the shooting in Eugene, and I included information about it in

6    various warrants, even though it was a subject of a separate

7    investigation.  Scott McGeachy and I learned that the Eugene

8    police had not searched any of the iPhones they seized the

9    night he was shot."

10   No officer put the date they learned of that in this

11   declaration.  And I would submit that the absence of that date

12   has meaning.

13        This is the Federal Government.  They have the ability to

14   have their law enforcement write detailed affidavits that are

15   supported by the facts of this case.  And the idea that knowing

16   that that is kind of a critical date here and the Federal

17   Government has chosen not to have their witnesses include that

18   information in the affidavit or explain in any other kind of

19   affidavit, when they have that information, goes to the

20   Government failing to meet their burden.

21        And I also want to note in regards to the iPhone situation

22   at the hospital, it's unclear to me where the Government is

23   getting that Mr. Hunt was told, "We are seizing the white

24   iPhone."  They've told, "We're taking your phone."

25        They told Mr. Hunt they were taking his phone and they

1    were going to get into it regardless of if he wanted to.  So

2    why would Mr. Hunt feel like he even had the ability, if we

3    even assume that he knew the Eugene Police Department had the

4    other phone, to go get it, when law enforcement told him, "Hey,

5    you told us you don't want us to take your phone.  You told us

6    you don't want to give us the password.  We're doing it

7    anyway."  That would tell a person in Mr. Hunt's position that,

8    even if he was on notice that they had his phone, that nothing

9    would come of it.

10       And what I will submit here, just in closing, is that I

11   think there are many inferences to draw -- many potential

12   inferences to draw from the facts of where the phone was found,

13   of lack of formal information provided to Mr. Hunt, and the

14   very fact that there are multiple inferences that could be

15   drawn from that and that the Government has made no effort or

16   put no evidence in the record to contradict one inference over

17   the other.  Given that their burden is by a preponderance of

18   the evidence, they simply can't get there.

19       They shouldn't get to rely on Mr. Hunt's -- on the theory

20   that he abandoned his interest in the phone when there are

21   multiple competing inferences that they have chosen not to

22   provide evidence on in order to clear them up.

23       And so at the end of the day, I -- this isn't a 0/1 --

24   this isn't a 0/1 analysis.  It's factually intensive; and,

25   quite frankly, it's a legal issue that I think is somewhat

1 novel.

2     And to what extent is the Government required to place

3 Mr. Hunt or a defendant on notice that they have become

4 interested in an object that belongs to them?

5     What I'll say here is my proposed rule of law to you,

6 Your Honor, is that, when the Federal Government became

7 interested in the phone, believed it belonged to Dontae Hunt,

8 that without him knowing that they had that, that they had that

9 interest, there was no way Mr. Hunt could have voluntarily

10 abandoned the interest in his phone because there's no proof

11 that he had any notice that they had that phone.

12     And, again, this is a case of multiple competing

13 inferences.  And given the fact that there are multiple

14 competing inferences, the Government simply has not met their

15 burden today.

16         THE COURT:  Let me ask one question, Ms. Thibeault --

17 and this is for the Government as well.  I note that neither

18 side actually submitted the warrant for the black iPhone or

19 either iPhone as an exhibit in this case.  I assume it's

20 because that is not really part of this analysis.  That was

21 already challenged in front of Judge Mosman?

22         MS. THIBEAULT:  I think that's correct.  That the

23 issue of probable cause was already challenged in front of

24 Judge Mosman.  We hope that that was adequately preserved.  I'm

25 not backing down from those arguments.  I just don't think,

1  given the previous orders in those, I'm free to argue about the

2  warrant.

3          THE COURT:  The warrant itself just isn't relevant to

4  the analysis I need to make?

5          MS. THIBEAULT:  I think so.

6          THE COURT:  Does the Government agree with that?

7          MR. SUSSMAN:  The content of the warrant is not

8  relevant.  I think what is relevant is when it was obtained and

9  how that figures into the reasonableness of any delay.

10          THE COURT:  And I assume -- I don't -- because it was

11  not submitted as an exhibit, is there any reason I -- I assume

12  you -- you submitted it -- somebody submitted it back before --

13  as an exhibit to one of the Judge Mosman pleadings.

14          MR. SUSSMAN:  It was originally attached as an -- I

15  believe it's Exhibit 21 to the defendant's motion to suppress,

16  and I -- I apologize.  I don't have the ECF number of the

17  original motion to suppress, but it's going to be in the

18  record.

19          THE COURT:  We can find it.  So I just thought at

20  some point I should look at what warrant too.

21          MR. SUSSMAN:  Yeah.  No, it is in the record,

22  Your Honor.

23          THE COURT:  Okay.  All right.

24      I'm going to take this motion under advisement.  I should

25  have a decision to you very quickly.  I know we're on a tight

1    time frame here.  So I am mindful of that.

2         And if not the end of this week, early next week I hope to

3    have my decision to you.

4         Let's -- why don't we take a 10-minute break, just to then

5    go talk about the discovery issues.  So let's resume at 11:45.

6                        (Recess taken.)

7              THE COURT:  We're back on the record.  We have all

8    counsel present.  We'll go over the one aspect of the motion to

9    compel, which is for the defense's seeking disclosure of, as I

10   understand it, all documents related to the Lorenzo Jones RICO

11   case, which is a separate, ongoing RICO prosecution.

12        It -- let me tell you my inclination first, and then

13   probably there's a couple of questions that I have.

14        My inclination is that the defendant does not get the vast

15   majority of that information in an unrelated investigation for

16   all the reasons stated, actually, in the Government's

17   opposition.

18        The question I do have is whether there is any limited

19   discovery from that case that does relate specifically to any

20   inferences that the Government might be seeking to introduce

21   regarding the December 2, 2017, shooting regarding drug

22   trafficking, and I just can't -- so I wanted the -- I thought

23   it would be helpful for my thinking about the case -- and then

24   I'll allow each of you to argue whatever you would like in

25   support of your respective positions -- but whether -- exactly

1   what evidence the Government is seeking to introduce in this

2   trial regarding the December 2, 2017, shooting.

3          MR. SAX:  Thank you, Your Honor.  The Government --

4   should I start, or do you want to give defense --

5          THE COURT:  I'm asking the Government that.

6          MR. SAX:  The Government does not intend to introduce

7   any evidence about the motive of that shooting or the identity

8   of the shooter or his gang affiliation.  The Government does

9   intend to ask law enforcement whether the person in the video

10  has been arrested and whether they're being prosecuted, but we

11  won't get into who they are or why they might have done what

12  they did.

13         THE COURT:  So what about the shooting is relevant?

14  I guess you're talking about guns.

15         MR. SAX:  It's the video that makes it relevant.  And

16  in the video, the Government's theory is the defendant is

17  holding a Gucci satchel, and that satchel is then, in the video

18  after the shooting, brought to a car, then brought to a

19  different car, and then a Gucci satchel is later found in

20  Aeisha Thomas' car, and it's the Government's theory that that

21  video helps establish defendant's possession of the satchel to

22  make its case for Count 4, which is felon in possession of a

23  firearm.

24        One other thing I just want to note is Count 5, the 924(c)

25  charge, relates to three firearms that do not relate to the

1    Eugene event.  Those are three guns that were found much later

2    at defendant's residence.

3            THE COURT:  So to what extent is the Government

4    planning to introduce evidence of the defendant's motive for

5    carrying the satchel, the Gucci satchel, with the firearms on

6    December 2, 2017?

7            MR. SAX:  We don't intend to get into that.  It's the

8    three guns from the Dekum residence that make up the firearms

9    in Count 5.

10           THE COURT:  I'm not asking about Count 5, but in

11   terms of what you plan to introduce about the Gucci satchel

12   guns.

13           MR. SAX:  Well, we'll establish his knowing

14   possession of the firearms as part of the elements that the

15   Government intends to prove, but his reasons for why he might

16   have carried the guns -- those guns we're not going to get

17   into.

18           THE COURT:  So in terms of -- because the suggestion,

19   as I understood it from the defendant's briefing, is you're

20   seeking to present inferences of having guns as part of drug

21   trafficking, and therefore some of the other motives for the

22   shooting from -- for Lorenzo Jones engaging in the shooting

23   come up, but that's the piece that I just -- whether or not

24   under Rule 16 that is -- they have made the showing of

25   materiality is what I'm trying to understand.

1          MR. SAX:  I'm not quite understanding the question.

2          THE COURT:  So the question is are they entitled to

3    know if -- if you're going to -- if the Government is going to

4    introduce evidence that Lorenzo -- in this case, that

5    Lorenzo Jones shot Mr. Hunt as part of a drug-related --

6          MR. SAX:  That's not our intent at all.  We are not

7    going to talk about the identity of the shooter or why they may

8    have acted.

9          THE COURT:  So the only -- or why Mr. Hunt is

10   carrying firearms?

11         MR. SAX:  Why he's carrying those firearms.  Correct.

12   We are not getting into that.

13         THE COURT:  And with regard to the shooting piece --

14   is it only that you can't really sever that from the video

15   because --

16         MR. SAX:  Exactly.  We have him carrying the satchel

17   before the shooting, and then after the shooting there's a

18   flurry of activity where the satchel is brought from -- I think

19   it's off camera -- on camera to a Lexus, then from a Lexus to a

20   departing Honda Civic, and that's a Honda Civic that's later

21   the subject of a vehicle stop where a tan satchel is recovered.

22         THE COURT:  Have you all -- the Government, that

23   is -- turned over any discovery regarding the December 2, 2017,

24   shooting and guns?  I mean, obviously, the search warrant has

25   been turned over.

1          MR. SAX:  We turned over police reports and the

2   surveillance video evidence receipts and photographs from the

3   scene of the shooting.

4          THE COURT:  Okay.  Is something -- assuming the

5   defense requests were about -- exclusively about -- not the

6   entirety of the Jones investigation but about just the

7   December 17, 2017 -- December 2, 2017, shooting, is it -- what

8   would not be included, as a general matter, with the material

9   that they're -- that you have already turned over?

10          MR. SAX:  And I neglected to mention that we also

11   turned over body cam footage from those events.

12      The follow-up investigation into who the shooter is, and

13   really anything that happened after the shooting related to the

14   investigation into the perpetrator.

15          THE COURT:  Okay.  So, really, the shooting --

16   evidence about the shooting itself.  Okay.

17      Let me hear any argument that the defense wants to make.

18          MR. ROBB:  Certainly.  Just to clear up the record, I

19   move to admit what I have labeled as Defense Exhibit -- it's

20   labeled as Exhibit 102 because I thought the other one might be

21   101, but it's the third superseding indictment in

22   Case 3:19-cr-00333, State v. Ronald Rhodes, Javier Hernandez,

23   and Lorenzo Jones.

24      I know that Your Honor is really familiar with that case,

25   but I want to just make sure that the record is clear on that.

1      A few kind of preliminary points that I'll make also for

2  the benefit of those -- those reading along at home, and when

3  that ever happens is that in that indictment the Government

4  ties the prosecution of Lorenzo Jones to drug -- to drug

5  trafficking.  Part of the Government's theory of the conspiracy

6  charges in the Lorenzo Jones case is that the Hoover gang

7  engages in a lot of unlawful activity -- drug activity being

8  one of those things that they do -- and that part of the

9  unlawful acts, in furtherance of those other unlawful acts, is

10  to use violence, including violence using firearms, to sort of

11  scare off other people that are going to compete with their

12  unlawful drug trafficking, and that's part of the MO of the

13  Hoover gang.

14      In some of the overt acts that the Government has pled in

15  that case that are in furtherance of all of these goals of

16  Lorenzo Jones' support of the -- of the Hoover gang is shooting

17  Dontae Hunt on December 2nd of 2017.

18      So right now the Government, in two different

19  prosecutions, is taking two completely different theories of

20  why that shooting happened.  In this indictment, they're saying

21  that the Hoover gang, of which Lorenzo Jones is a member of,

22  participates in drug -- drug trafficking activities and in

23  furtherance of that, uses firearm violence to support that and

24  that part -- one of the overt acts, as part of that enterprise,

25  is shooting Dontae Hunt on December 2nd.

1      That's the -- that's the case that the Government has laid

2  out against the person that they have charged, in part, with

3  shooting Mr. Hunt.

4      So to the second, kind of, thing I'll say, as a

5  preliminary point, is that Mr. Sussman is absolutely correct.

6  Brian Walker filed a motion to sever the firearm possession

7  count on December 2, 2017, with the rest of the remaining

8  charges, making that precise argument.  He says, "This is not

9  relevant to drug" -- that there's no evidence -- that the basis

10  for severance is that the possession of the -- that the

11  circumstances of the shooting are not relevant to the drug

12  trafficking activity that they've pled in the rest of the

13  counts and one that includes -- I'll swing back around to this

14  again -- the 924(c) charge, which Mr. Sax correctly notes

15  they've kind of pled in the indictment as just relating to the

16  firearms seized during the September 27th execution of the

17  warrant, and they haven't pled that he -- that he possessed the

18  firearm on December 2nd in furtherance of the drug trafficking

19  activity otherwise pled.

20      And, Your Honor, based on the representations that Mr. Sax

21  has made, I would like to reraise the motion to sever because

22  the arguments that the Government is making right now are

23  opposite to the arguments that they made to Judge Mosman to --

24  that led Judge Mosman to deny the motion to sever that count

25  from the remaining charges.

1          What the Government told Judge Mosman at that time was

2    that Mr. Walker's argument for severance -- and I'm quoting

3    from page 2 of the Government's response to the motion to

4    sever -- that the defense argument ignores the fact that his --

5    Mr. Hunt's -- possession of the firearms occurred during the

6    course and in furtherance of the conspiracy, that firearms are

7    tools of the trade for drug traffickers, and that evidence of

8    the defendant's possession of those guns -- again, we're

9    talking about the December 2nd guns -- that that evidence is

10   related to the remaining -- the remaining charges.

11         So the Government has, in a variety of different contexts,

12   both in the Lorenzo Jones case and even inside Mr. Hunt's case,

13   is taking a couple of different positions on why that shooting

14   occurred and what the Court should do with that evidence.

15         It took me -- I mean, this didn't -- I -- without

16   abandoning any requests, I understand Your Honor's inclination

17   that material that is directly relevant to specifically the

18   December 2nd shooting might be something that is discoverable

19   under Rule 16, but things further afield than that might not

20   be.

21              THE COURT:  And I'm not certain on the December 2nd,

22   but that's what I feel like I --

23              MR. ROBB:  So I -- so here's the -- there's kind of

24   the factual nuances that the Government -- it took me a while

25   to kind of process this.  It didn't seem like a particularly

1    close issue to me; so I was trying to figure out what the

2    Government meant.

3         So the position that the Government is taking is a very

4    nuanced one and a very narrow one.  The position that the

5    Government is taking, at least as -- when they were arguing the

6    motion to sever, is that Mr. Hunt's possession of the firearm

7    was related to the drug charges but the fact that Mr. Hunt was

8    shot by somebody was not related to the drug charges.  I mean,

9    that's really the two factual assertions that the Government

10   necessarily needs to make in order to render the underlying

11   investigation of who shot Mr. Hunt not material under an

12   analysis under Rule 16.

13        But here is the paradox that I think the Government is in,

14   is those assertions are testable, and they're testable by

15   evidence that the Government has and is refusing to give.

16        So I -- I think one of two things needs to -- I mean, so,

17   one, I think, because the evidence of possession is primarily

18   circumstantial, any motive that Mr. Hunt would have had to

19   possess -- to happen to possess firearms on that night is

20   certainly relevant, and the defense has the -- should have the

21   opportunity to examine material in the possession of the

22   Government that might be relevant to that.

23             THE COURT:  When you say it's "circumstantial," is it

24   because there's a question of whether Mr. Hunt knows what is in

25   the satchel that he's carrying?

1        MR. ROBB:  There's no evidence of when the guns were

2   in the satchel.  The only evidence of when the guns were

3   contained in the satchel was much later, when Ms. Jones

4   possessed the satchel.

5        THE COURT:  So later that same evening?

6        MR. ROBB:  It's a circumstantial inference that you

7   need to draw that the guns were in the satchel at the time that

8   Mr. Hunt was carrying it.

9        THE COURT:  Although don't officers see the -- and

10   I'm not -- obviously, I have not seen the full surveillance

11   video.

12        MR. ROBB:  Right.

13        THE COURT:  But it sounded like you see Mr. Hunt with

14   the satchel.  You don't know what's in it because you can't see

15   through it, but he's carrying something.  Then it's picked up

16   by -- I don't know if it's Rylie Jones or Mr. Hunt's

17   girlfriend -- put in the Lexus; then it's seen transferred to

18   the Honda, and then police stop them on the way to the hospital

19   or after.

20        MR. ROBB:  No.  It's a little bit more --

21        THE COURT:  Okay.

22        MR. ROBB:  -- more attenuated than that.

23        So, one, it's an inference that the same satchel that

24   Mr. Hunt is carrying is the one that the guns were ultimately

25   in.

1    You can draw that inference just on the general size and

2    shape of the satchel and kind of the car that it's in, based on

3    the video, but it's certainly not a -- something that direct

4    evidence confirms that that is indeed the same -- the same bag.

5         So that's a little bit of a side point of what I was going

6    to try to get into.

7              THE COURT:  Let me just jump in about something you

8    said before that.  I'm having difficulty understanding why

9    Mr. Jones's motive as the alleged shooter of Mr. Hunt on

10   December 2nd, why that matters.  So what?  So what?  He was

11   whatever.  He wanted to kill him because he's in the Hoover

12   gang, doesn't matter.

13             MR. ROBB:  Did Mr. Hunt know that Mr. Jones was in --

14   or whoever shot him, I mean, did he -- did Mr. Hunt know that

15   whoever shot him had a motive to shoot him?

16             THE COURT:  Why does what matter in -- for a jury to

17   determine whether Mr. Hunt knowingly possessed the firearms?

18             MR. ROBB:  Because I think the evidence demonstrates

19   that these aren't his firearms.  These are Rylie Jones's

20   firearms that she's firing at the firing range and are with her

21   when they're found.  So a --

22             THE COURT:  But that's --

23             MR. ROBB:  And so what the Government is alleging is

24   he specifically possessed them on that day and time.

25        So the question becomes what is the circumstantial

1   evidence that makes that more likely that he did choose to arm

2   himself with Rylie Jones's firearms on that night?  And the

3   circumstances of that night are highly relevant to that.

4       Whether I -- I am coming home from somewhere, whether I'm

5   choosing to be armed or not, that choice will depend on all of

6   the attendant circumstances surrounding what is happening in my

7   life at that point.

8           THE COURT:  But aren't you -- in a way, it's -- if

9   the Government gets in evidence that Mr. Hunt knew that

10  Mr. Jones was going to get him, that's worse for your case.

11          MR. ROBB:  Absolutely.  And under Rule 16, even if

12  it's worse for the case, we get it.

13      And vice versa --

14          THE COURT:  But the Government is not even going to

15  present that evidence.

16          MR. ROBB:  Well, they --

17          THE COURT:  Right?

18          MR. ROBB:  The Government is choosing not to present

19  evidence that it has.  It's making a choice not to present

20  evidence that it has acknowledged to the Court that it has, and

21  that's the -- that's the whole point of Rule 16 is that the

22  Government doesn't get to have evidence, make tactical choices

23  not to use it, and then, when it's material to potential

24  defenses, also choose not to turn it over to the defense so the

25  defense gets to make its own choices about what evidence is

1    relevant and what is not and what to develop and in -- what to

2    develop in investigation follow-ups on and how to otherwise

3    prepare a defense based on evidence that's in the Government's

4    possession, that's not otherwise findable by the defense, and

5    that's material to the defense of the case.

6              THE COURT:  So, again, it's -- you're not arguing

7    that it's *Brady*.

8              MR. ROBB:  I don't know if it's *Brady* or not.

9              THE COURT:  So --

10             MR. ROBB:  And I think that I have an inference that

11   it is *Brady*.

12        So what the Government is saying in the motion to sever

13   response is that Mr. Hunt -- is that guns are tools of the

14   trade of drug dealers, Mr. Hunt was engaged in the drug

15   conspiracy that they have charged on December 2nd at the time

16   that he has those firearms, and that evidence of that

17   possession of the firearms is relevant and admissible to the

18   jury considering the remaining -- the remaining charges.

19        One of the charges is the 924(c) charge.  That happens to

20   be the most serious charge that Mr. Hunt faces and the most

21   important one, as in terms of the defense, to challenge.

22        What matters for the 924(c) charge is what Mr. Hunt's

23   intent was in possessing firearms and whether Mr. Hunt

24   possessed the firearms for the purposes of furthering any

25   drug -- furthering the charged drug trafficking.

So why Mr. Hunt chose -- if the Government convinces the
jury that he did possess firearms, the next question for the
jury, necessarily, in the 924(c) charge, is that the reason
that Mr. Hunt possessed the firearms was to further the other
drug trafficking activity that's also been charged.

And in their opening statement, we -- I mean, we -- we
know how the Government is going to argue that to the jury.
They are going to put on an expert witness.  That witness is
going to say, "Guns are tools of the trade of drug dealers.
The reason why drug dealers have guns is to protect themselves
and their guns -- and their drugs from other drug dealers.
This is a violent trade.  It's a black market.  There are
violent people.  There's violence that goes on.  So the reason
you, jury, get to infer that his possession of firearms was in
furtherance of his drug -- of the drug trafficking was that
people who deal drugs might get shot at or might otherwise have
people want to do them harm; and, therefore, that -- to guard
themselves against that, it behooves a drug dealer to arm
themselves, and here we can show you that Mr. Hunt was armed."

The other thing that the Government wants to show the jury
in this case and then get to argue that it's relevant to the
924(c) charge is Mr. Hunt actually being shot.  And not just
being shot, that a -- another human being arrived at his -- at
the apartment complex that his girlfriend was living at 45
minutes or so before he did and sat there in the shadows for 45

minutes, waiting for Mr. Hunt to walk out from his car, and
that the moment that Mr. Hunt walks in front of this person, he
steps out of the shadows and unloads -- I don't know how many
shots -- eight or nine shots.  Pretty much he -- he fires the
gun until it stops firing, and then he turns around and runs
away.

And so what the Government is hoping to do is to present
all of this evidence to the jury, present expert witnesses
saying that firearms are tools of the trade of drug dealers
because of precisely the risk of what actually happened to
Mr. Hunt on December 2nd -- that he might get shot at.

And then in a separate case in this courtroom, the
Government is also arguing that part of what the Hoover gang
does, including Lorenzo Jones, is to use firearm violence to
support their own drug trafficking.  I mean, this is precisely
what the State's expert is going to testify at this trial as
the reason why drug dealers carry firearms.

So it's a necessary part of preparing a defense on this
case -- to understand whether the reason why Mr. Hunt was shot
at on December 2nd was related to drug trafficking or whether
it was related to some other thing.

It's also exculpatory, potentially, on the 924(c) charge.
If, as the Government is taking the position here, the motives
for Lorenzo Jones, or whoever it was to shoot and try kill
Mr. Hunt, was not related to drug trafficking in any way, then

1    that is -- that could be evidence that the defense could use to

2    argue to the jury that, even if the jury finds that Mr. Hunt

3    possessed firearms, this wasn't related to his alleged drug

4    trafficking, that it was related to something else.

5            THE COURT:  And so the other possibility would be

6    they're rival gangs; right?

7            MR. ROBB:  Rival gangs.  Maybe they have some

8    other -- I mean, the answer to your question, Your Honor, is "I

9    don't know" because the Government has evidence they're not

10   giving me.

11           THE COURT:  But how could that even be exculpatory

12   for your client?  That's what --

13           MR. ROBB:  What the 924(c) case law makes quite clear

14   is to be guilty of 924(c), the defendant's intent in possessing

15   the firearm needs to have been to further his unlawful

16   activities that are otherwise charged.  In this case drugs.

17       So in order to reach a conviction on the 924(c), which is

18   the most serious count in this case, the jury will need to find

19   that the Government has proven beyond a reasonable doubt that

20   Mr. Hunt's intent in possessing firearms was to further his

21   activities dealing drugs.  And what the -- what the

22   Ninth Circuit has also made clear is that, if the possession of

23   the firearms is not factually related, it just happens to be

24   coincidental to drug -- drug trafficking activity, that that

25   person is not guilty of carrying in furtherance of the drug

1    charge.

2        So if -- so to make another factual point, the Government

3    just will not present any evidence that Mr. Hunt was carrying

4    guns while dealing drugs.  There's not really going to be any

5    evidence of Mr. Hunt actually engaging in any drug deals at

6    all.  What they hope the entire basis of the 924(c) charge

7    is -- the circumstantial evidence of guns being at the house

8    that he was at, when they served the search warrant, and having

9    a small amount of drugs also at that house.

10       That is the -- that's the -- that's the evidence on the

11   924(c) charge.

12       In their motion to sever, what they are arguing is that,

13   in order to support that inference that Mr. Hunt possessed

14   those firearms in furtherance of his drug dealing, that the

15   jury gets to rely on the evidence from his possession on the --

16   on December 2nd of his possession of the firearms there.

17       Mr. Sax is correct they haven't charged the 924(c) as on

18   December 2nd.  They've only charged it at the subsequent date.

19   But what they argued at the motion to suppress and the -- to

20   defeat the motion to sever is that the jury could consider the

21   evidence of his possession on December 2nd to consider whether

22   he's guilty of the 924(c) charge.

23       So what the -- if the defense could argue that the -- as

24   the Government has argued -- I mean -- so I suspect that this

25   is what the evidence shows, that the shooting on December 2nd

had nothing to do with any drug dealing activity that Mr. Hunt was also doing at the same time, this is the factual position the Government is taking in this courtroom now.  If that's true, that's exculpatory as to the 924(c) charge.  And it's a basis to sever the December 2nd count from the remaining counts for that reason.

THE COURT:  Okay.  Thank you, Mr. Robb.

Who's arguing?  Mr. Sax?

MR. SAX:  Yeah.  Just a few points.  I wasn't prepared to address the motion to sever.  We can discuss that further at a later date, but just for the Court's benefit, Mr. Hunt's blood was found on the -- one of the guns in the satchel and a gun box, matching one of the guns; was found underneath his bed at the Dekum Street residence, along with a handwritten receipt for one of the guns.  So that's one of the reasons why the two events are considered intertwined from the Government's perspective.

I'm still having trouble understanding the defense argument about why it's relevant -- the intent of the shooter. Let's say Lorenzo Jones wanted to shoot Dontae Hunt because he's a Sagitarrius.  Why does that matter?  Isn't what matters Dontae Hunt's intent in whether or not he possessed the firearms?  And it may or may not be in discovery for the Hoover case why the shooter shot at Dontae Hunt.  But at the time he doesn't know what those motivations are.  And if he doesn't

know it, it seems like it would be completely irrelevant to his behaviors.

Also, the elements of felon in possession don't include sort of a defense, other than a narrow necessity self-defense claim, which doesn't really apply here.  The intent of the possessor is really irrelevant to Count 4, the felon in possession, other than whether he knowingly possessed firearms.

So the intent of the shooter really has no bearing on the Government's ability to establish the elements of felon in possession, which is the crime that relates to the guns that were in the satchel.

THE COURT:  So it sounds like, Mr. Robb -- again, I understand you're not prepared necessarily to verbatim discuss what happened at the motion for severance, but the -- if I understood correctly, the Government is taking the position now, in this case, not to say, with regard to December 2, 2017, that he's carrying the firearms because he's involved in drug trafficking.

MR. SAX:  I -- I expect there will be expert testimony about drug dealers carrying guns and why they carry guns, and there will be evidence that he was drug trafficking at that time, but we will not be arguing -- or we will not be adducing evidence that he carried those particular guns on that date in furtherance of drug trafficking.  Our focus will be on the guns in the house that were found later.

1          THE COURT:  So what about Mr. Robb's argument that,

2     if Mr. Jones was allegedly shooting Mr. Hunt not because of

3     drug trafficking at all, is that exculpatory evidence that the

4     defense should get in this case?

5          MR. SAX:  No.  Because the -- what matters is what

6     defendant thought, not what the shooter thought.  And the

7     defendant's actions can't based on something that was -- you

8     know, if we say -- say there's discovery about the motivations

9     of the shooter.  Those weren't available to the defendant when

10    agents executed a search warrant on his house on -- the Dekum

11    Street residence.

12       So I'm still having trouble understanding why the motive

13    of the shooter would be a defense to Dontae Hunt if he doesn't

14    know the motive at the time that the alleged crimes are

15    happening.

16         THE COURT:  So what if, for example, the information

17    regarding Mr. Jones shooting Mr. -- allegedly shooting Mr. Hunt

18    on December 2nd showed it was because Mr. Jones is a Hoover and

19    Mr. Hunt is a member of a rival gang and wasn't related to drug

20    trafficking?  Then, what about Mr. Robb's point that that is

21    evidence that is potentially exculpatory in the 924(c) count?

22         MR. SAX:  He's welcome to adduce evidence about why

23    he did what he did or, "Hey, I thought it was gang

24    retaliation," but the --

25         THE COURT:  But yes --

1    MR. SAX:  -- but that can come from him.

2    THE COURT:  But why should he not be able to get some

3    of the -- I mean, say, for the sake of argument, information

4    discovery supports that that's why Mr. Jones shot at the

5    defendant.  Wouldn't that be information the defense should

6    get?  And, if not, why not?

7    MR. SAX:  The internal motivations of the shooter

8    aren't relevant to the defendant's sort of perceptions.  He may

9    have been mistaken.  Mr. Hunt may have been mistaken as to the

10    reason for the shooting.

11    THE COURT:  Doesn't it bolster the legitimacy of his

12    view that it's "I'm carrying this to protect me from the

13    Hoovers, as opposed to because I'm in a gang -- or because I'm

14    a drug trafficker"?

15    MR. SAX:  He's welcome to make that argument in his

16    defense, but I -- I'm still not understanding why the discovery

17    about a separate investigation to a shooter that we're only

18    producing because of the evidentiary value of that surveillance

19    video, still -- still not following why -- why that would be

20    something he gets to view in terms of discovery.

21    THE COURT:  Well, defense gets to get information,

22    other information, that's in the hands of the Government about

23    circumstances that might support their theory of the case;

24    right?

25    MR. SAX:  If it's material and relevant, yes.

1             THE COURT:  Right.  So --

2             MR. SAX:  So are we in agreement that it's not

3   material or relevant to the 922(g), the felon in possession

4   charge?

5             THE COURT:  I think Mr. Robb would say, no, he's not

6   in agreement on that.

7             MR. ROBB:  No, not at all.

8             MR. SAX:  Is there any case law to support the

9   proposition that the intent -- other than the -- in the narrow

10  necessity self-defense claim, that the intent of the possessor

11  is relevant in a 922(g) case?

12            THE COURT:  Well, I think, it -- Mr. Robb, if I

13  understood correctly, made the argument of the -- the relevance

14  argument that the Government is going to put on an expert that

15  says, "Carrying guns is a tool of the drug trafficking trade,"

16  and that then suggests that, then, because there's evidence --

17  presumably, the Government is going to present evidence

18  throughout the trial of Mr. Hunt engaging in drug trafficking.

19  That then goes to his motive to -- certainly, it's -- the

20  inference is it goes to his motive for carrying the guns on

21  December 2 of 2017.

22        So the question is whether that other information about

23  December 17th -- December 2, 2017, is at least information that

24  should be disclosed to the defense.  Because it is hard to

25  segregate each of the counts and the motive for each.  So

1    what -- obviously, interviews about -- of others, could that be

2    relevant to the circumstances of December 2, 2017?

3        You're actually establishing that there's a relationship

4    between the counts; so that's, you know, as I understand it at

5    least, what Mr. Robb is arguing that's why they should get

6    information about that event.  And the information has been

7    discovered in the Rhodes case involving Mr. Jones but not in

8    this case.

9        MR. SAX:  I don't quite understand the question.

10        THE COURT:  You suggest that nothing about an

11    investigation of December 2nd is relevant or material, but you

12    want to introduce events from that date?

13        MR. SAX:  Yes.

14        THE COURT:  I guess I'm still -- because you have

15    connected all the charges.

16        MR. SAX:  There's evidence from the house that

17    relates to the possession of firearms in the Eugene parking

18    lot.

19        THE COURT:  Has there been a review for exculpatory

20    information for Mr. Hunt, by your office, of the evidence in

21    the Lorenzo Jones case?  And if so, what kind of review?

22        MR. SAX:  I'll have to consult with the AUSAs in that

23    case.  I believe we've turned over the materials related to the

24    shooting.

25        And I'm still having trouble understanding.  So the

1    argument is, if it was a gang shooting, that that's -- that

2    would be exculpatory because it would provide a motivation for

3    Mr. Hunt to have a gun eight months later?

4                 THE COURT:  That's what Mr. Robb is arguing.

5                 MR. ROBB:  He was shot eight months earlier, and now

6    he has a gun.  And what the Government needs to argue to the

7    jury on the 924(c) is that the reason he had the gun was not to

8    defend himself against this other person that might come shoot

9    him again -- because I'm not sure that person had been caught

10   by that point -- but that he was doing it to further a drug

11   deal.

12       That's going to be -- that's probably the prime question

13   for this case.  Most of Mr. Hunt's -- a great deal of

14   Mr. Hunt's sentencing exposure in this case will turn on

15   precisely that question.

16                 THE COURT:  Do you want to respond, Mr. Sax?

17                 MR. SAX:  Let me consult with my co-counsel.

18                 THE COURT:  Why don't we do this:  Since we're still

19   going to -- my inclination is I'm still -- it's likely to be my

20   ruling that the vast majority of the Rhodes discovery is not --

21   defendant hasn't shown the materiality of that discovery, and

22   the Government makes a compelling reason why we should not err

23   on the side of overdisclosure in that case and provide

24   information about a rival gang RICO charge to -- in Mr. Hunt's

25   case -- I find it completely irrelevant to the charges here.

1          Where I'm just trying to make sure is, one, that there's

2    no *Brady* information regarding Mr. Hunt, along the lines that

3    Mr. Robb is suggesting, and, that is, to the extent defense --

4    I don't know if it's very compelling defense, and it may be

5    worse for the defendant than positive for the defendant, but a

6    gang-motivated shooting that may have caused Mr. Hunt to carry

7    a weapon is certainly relevant to the case.  The question is,

8    is there some evidence of that, that the -- it might arguably

9    be exculpatory for the 924(c) charge, whether -- that it's in

10   furtherance of protection from a rival gang.

11         Now, again, I don't know why defense can -- can't already

12   make this argument, but it does require them to say that

13   Mr. Hunt is part of a rival gang; so -- and we haven't yet

14   talked about where gang evidence fits in here.  But, certainly,

15   defense would be opening up the door to Mr. Hunt's gang

16   affiliations if they go that route.  And if they are not going

17   that route, then I would not order any of that discovery.

18         But I think the Government should at least be doing a

19   *Brady* review of the evidence surrounding the December 2, 2017,

20   shooting.

21              MR. SAX:  And I just want to get clarification on the

22   contours of that review.  That's any motivation -- gang-related

23   or otherwise -- why the shooter might have acted?

24              THE COURT:  Anything that would cut against carrying

25   the firearms as part of drug trafficking?

1        Is that -- would you consider that exculpatory, Mr. Robb?

2            MR. ROBB:  The reason you carry firearms is to defend

3    yourself or to inflict violence on somebody else, and I think

4    evidence that Mr. Hunt was shot multiple times would give any

5    rational person reason to believe he wanted to possess firearms

6    to defend himself from that happening in the future.

7        And, I mean, the --

8            THE COURT:  So you can already present that to a

9    jury.  If you wanted to.  Again --

10           MR. ROBB:  Well, so here's the question:  Was this

11   out of the blue?  Were there events that precipitated this

12   happening?  And were they events that Mr. Hunt was privy to?

13       I mean, the answers to all of these questions, presumably,

14   are found in the material that the Government has, and they're

15   all relevant to answering those.  And I think what

16   discoverability turns on is not the defense that the defense

17   chooses to present at the trial, but the defense is allowed to

18   examine all of the evidence that is relevant to alternative

19   defenses.  And then after a full and fair chance to review all

20   that evidence, then to decide what evidence to present to the

21   jury at the trial.

22       So regardless of whether or not the defense chooses to

23   assert any alleged gang motive that precipitated the shooting

24   or not, I don't know the answer to that question.

25       But we are permitted to evaluate that and to use the

1   evidence that the Government has that's relevant to that in --

2   in the process of both evaluating that defense, evaluating

3   whether there's any additional investigation follow-up that

4   needs to go on, and to be fully informed to decide how to best

5   defend the case.  I mean, that's the underlying principles of

6   all of these rules.

7              THE COURT:  Understood.  Although the defense for the

8   December 2, 2017, felon in possession charges related to the

9   firearms, presumably, one defense is your client doesn't know

10  what is in that satchel or the guns weren't in the satchel at

11  the time that he's carrying it.  So he either didn't carry it

12  or doesn't know what is in it.  And other than that -- and that

13  they're somebody else's firearms.

14     So the possession or the ownership of the firearms by

15  somebody else certainly would be exculpatory information.  So

16  if any aspect of the investigation from that evening reveals

17  that the guns really belong to someone else, that seems

18  exculpatory, and defense should get it.  If it's that somebody

19  else carried those guns to the scene, that is probably

20  something that defense should get.  In terms of other defenses,

21  I don't see any other --

22              MR. ROBB:  So whether Mr. Hunt knowingly possessed

23  the firearms, I agree, is the issue as to that count.  There's

24  evidence that these were either Rylie Jones's firearms or that

25  she at least had enough of a possessory right to those firearms

1    that she was transporting them out of state for purposes of

2    going to the gun range with her dad.

3         And so the question becomes is what evidence is there that

4    Mr. Hunt actually possessed the firearms on that day?

5         And it's circumstantial here.  Like, what the -- to

6    convict Mr. Hunt of the possession, what the jury will need to

7    believe is at the time -- is that in that satchel, at the time

8    Mr. Hunt was carrying it, there were, indeed, those two

9    firearms, or at least one of those firearms in that satchel,

10   and that he knew it was in there.

11        What type of circumstantial evidence might make it more or

12   less likely, one, that he put the guns in there or, two, that

13   he was carrying them, knowing that they were in there.

14        Well, if something had just happened slightly before that

15   incident, which makes it more likely that he believed that he

16   might be shot at, that would be relevant to that question.

17             THE COURT:  Do you disagree with that?

18             MR. SAX:  I don't think the case law supports that.

19   For a strict felon in possession charge, I think they just have

20   the elements.  Unless it's a necessity -- or a necessity

21   defense, that the motivations for why someone is carrying or

22   not carrying a gun don't come in.

23             THE COURT:  It's not material?

24             MR. SAX:  To --

25             THE COURT:  I mean, under Rule 16, you're saying that

1   doesn't -- that's not material evidence?

2            MR. SAX:  Maybe I'm talking about the elements to

3   prove at trial rather than discovery.

4            THE COURT:  Right.  You don't have to bring up motive

5   if you don't want to, but it's not the standard for Rule 16.

6            MR. SAX:  I still don't understand -- I appreciate

7   the argument of 924(c).  I still don't grasp the argument about

8   why someone's motive in -- motive for carrying a gun or not

9   carrying a gun would be relevant as a defense in a felon in

10  possession case.

11           THE COURT:  All right.  So I -- I think, if there is

12  evidence in the -- or information relating to Mr. Hunt's motive

13  for carrying the firearms, that seems, to me, to be material.

14     So I would ask the Government to make sure that the -- or

15  to do some kind of review of the information obtained.  To the

16  extent it's all separate, I assume you would already know if

17  there's information relating to the Hunt investigation that

18  came up in the Rhodes investigation.

19           MR. SAX:  One of the issues is a lot of the -- I'm

20  told a lot of the Hoover RICO discovery is information from

21  cooperators.  So it's going to be real swamped, in terms of

22  figuring out -- it just comes from very sensitive sources that

23  the Government is going to be very reluctant to identify.

24           THE COURT:  All right.  Let's do -- do we have a

25  date -- we have now briefing dates set for the confidential

1    informant motion; right?

2           MR. SAX:  Yes.

3           THE COURT:  When are we hearing that motion?

4           MR. SAX:  We haven't set a date.  That also gets to

5    the issue of the trial date, and Mr. Robb and I can --

6           THE COURT:  Yeah, I do want to talk about the trial

7    date.

8        I don't know if the confidential informant motion overlaps

9    with some of the issues about December 2, 2017.  Does it at

10   all, or not?

11          MR. ROBB:  No.

12          MR. SAX:  I don't think so.

13          THE COURT:  Okay.  I'm going to think about the -- I

14   think I understand what the defense is arguing for the

15   December 2nd -- or the information from the Rhodes case.  I

16   want to think about that.

17       I want the Government to at least -- I just would hate for

18   this to come down, and you haven't done any kind of *Brady*

19   review of the evidence from December 17th -- excuse me --

20   December 2, 2017, in the Rhodes case when it relates to the

21   same incident where he's shot.  So I want to make sure there's

22   no *Brady* information in that that would go to any of the

23   defenses that the defense might have in this case.

24       So I don't know how best you can accomplish that.

25          MR. SAX:  Just, hypothetically, let's say the

1   shooter's motivation is retaliation.  Is that -- are we

2   potentially turning over information about the shooter's

3   motives or just about what you said earlier about information

4   as to Mr. Hunt's motive for carrying a gun?

5           THE COURT:  It would presumably be what Mr. Hunt

6   would be aware of at the time.

7       So anything that goes to Mr. Hunt's motive to carry the

8   firearm or not on December 2, 2017; and I'm not inclined to

9   provide a bunch of information about or give the defense access

10  to cooperator information.  So I want the Government to think

11  about whether there's -- I want at least a review of

12  information that might go to what Mr. Hunt knew at the time he

13  walked across that parking lot on December 2, 2017, that might

14  either implicate somebody else in the firearms that he's

15  carrying or provide a motive for Mr. Hunt to carry a firearm

16  because he knew that he was under attack, for example.

17      So is that something that the Government can figure out

18  how to accomplish?

19          MR. SAX:  We can look into it.  I foresee some

20  pushback about the cooperator issue.  Because I believe some of

21  this information is coming from cooperators.  So we'll likely

22  have to revisit this after the Government has explored the

23  contents.

24          THE COURT:  Okay.  Let me -- then we have the

25  briefing schedule.  Let's talk about the continuance because I

1    can decide these motions quickly.  So both the motion to

2    suppress the iPhone and the information on at least -- even if

3    I were to allow the defense any of the information that they

4    seek with regard to the Rhodes case -- which I'm not saying I'm

5    going to -- I just -- even if I'm persuaded that some limited

6    information should be disclosed, that could happen very quickly

7    because it would be quite limited.

8        In terms of -- I know we're not today litigating the issue

9    of whether there are *Brady* violations in connection with the

10   case, and I know the Government wanted time to brief that and

11   asked me to have briefing by April 22nd -- which I agreed with

12   them to do -- I did want the speedy trial issue resolved, as I

13   mentioned, and is the Government going be prepared to give me a

14   brief on that by Friday?

15             MR. SAX:  Your Honor, I have spoken with Mr. Robb.

16   We ask to have until Monday, if that's okay with the Court, and

17   the defense is not opposed.

18             THE COURT:  Okay.  Again, I want to decide that

19   because I'm trying not to push the trial date because, as

20   Mr. Hunt knows, when we were back here with Mr. Warren a long

21   time ago, I really wanted this case to go, and I know you did,

22   and obviously back -- you've already tried -- started this case

23   once.

24             THE DEFENDANT:  Uh-huh.

25             THE COURT:  I'm trying to get this case to trial

May 10th.

I understand that there's been a lot of additional discovery provided at this time.  Is the Government -- I'm trying to understand the Government's position because it said "unopposed motion for a continuance."  Is it the Government's position that I should grant a continuance by the defense at this time?

MR. SAX:  Yes.  The Government -- I think everyone only wants to try this case once.  And given the current landscape -- and I've spoken with Mr. Robb, and he can address this as well -- I think the prudent move here is -- we recognize this case is very old.  Mr. Hunt has been in custody the whole time.  But given all the moving parts, the Government supports defense's motion for a continuance.

THE COURT:  Is there a reason for the delay in getting this discovery?

MR. SAX:  The Government will address that in its briefing.

THE COURT:  Okay.

And, Mr. Hunt, are you in favor of a further delay in this the case?

MR. ROBB:  In -- I think we did file the written waiver for Mr. Hunt that kind of stakes out the defense's -- the defense's position.  We were ready to go to trial on May 10th but for the discovery disclosures that happened

recently.  And one of the other things that I realized in
assessing that was that a motion for -- to suppress and for a
*Franks* hearing on one of the key search warrants in this case
had been litigated before the provision of material that I
think is relevant and helpful for the defense in that motion.

So given that circumstance and the circumstance of the
discovery material that was recently -- that was recently
given, I just don't feel I can do a constitutionally adequate
job of analyzing everything and being ready for everything by
May 10th, given the recent material that was provided.

That being said, we have asked for alternative remedies
before that, and we would hold to that.

So if the Court were to -- I mean, obviously, the remedy
of dismissal would solve that problem, and Your Honor can think
about that; but if the Court were to exclude any evidence that
would turn on further review of the material I just received
from the -- from the Government's case, we would be happy to go
out on May 10th.

THE COURT:  Is it possible to let me know what kind
of information it was?

MR. ROBB:  So there's a few things that have
happened, and I still don't have one of the reports.  So the --
a bulk of emails were provided in regards to two of the
Government witnesses, between Mr. Hunt and them, and it's
thousands of -- thousands of pages.  And being able to

1   adequately have time to review all of that correspondence and

2   decide whether it's relevant and whether it changes defense

3   strategies or strategies to cross-examine those witnesses, is

4   something that we need to do.  We were ready to proceed to

5   trial and to cross-examine those witnesses prior to those --

6   seeing those emails.

7          There's an issue -- I've also received a lot of discovery

8   in Mr. Hunt's other case.  I think the Government is going to

9   be taking the position that there might be some overlap of

10  that.  I did a quick review, and I didn't see any overlap of

11  that.  But the discovery in that case is vast, and I have -- I

12  did, I think, my due diligence to try to look through that and

13  see what might be relevant in this case and review it in the

14  context of this case.  But I -- I could not find the same batch

15  of emails that were given to me recently in that other batch.

16  I have not looked at them yet.

17         The second thing is in regards to the Alexander

18  Olivo-Altheimer material and how he is involved in this case.

19  The only evidence of Mr. Hunt ever purchasing counterfeit

20  oxycodone pills, which is the key of the mandatory minimum drug

21  charge in this case, is a single text message correspondence

22  with Mr. Olivo-Altheimer from Mr. Hunt's phone.

23         I was aware of that and had looked at that and looked at a

24  little bit of what the discovery materials of

25  Mr. Olivo-Altheimer were; and sort of reading between the lines

1   on a few things, I realized there was a whole just trove of

2   other information that the Government had about this person.

3   They proceeded on their own separate investigation of him that

4   became a very mature one that involved search warrants and

5   things like that.

6       So one of the things I need to do is to fully examine --

7   since he's the only known source of supply in the Government's

8   case and in this case, I need the opportunity to really look

9   into him in a thorough way, including reviewing his phone,

10  which is quite large; reading other witness reports about what

11  he was doing; and to do a follow-up investigation based on that

12  and talk to other witnesses and things like that.

13      And the reason for that is because the evidence appears to

14  suggest that Mr. Olivo-Altheimer was not transacting with

15  Mr. Hunt for counterfeit oxycodone pills, as the Government

16  will use that for.  I think the evidence strongly suggests that

17  it was not for those types of pills.

18      So adequately being able to deal with that text message

19  correspondence will involve reviewing tens of thousands of

20  pages of materials from that case.

21      So that's sort of the second thing.

22      The third thing is there's a new witness that was not part

23  of the original case that the Government still has not provided

24  me a copy of the interview report for.  I've read it.  I have

25  taken notes on it, but the -- it was a new disclosure that

1    happened very recently, and I think there might be some

2    follow-up investigation and things that -- the defense will

3    need to do that.  And having the -- having the interview

4    report, which I still don't have, will be part of that.

5         And so all of this is a long way of saying that a month

6    ago I think we were ready to go.  Actually, no, because I have

7    been requesting some of these things for longer than a month

8    ago.  Before I realized there was not a lot more materials out

9    there that was relevant to defending the case, we were ready to

10   go.  Now that I both am aware that there's more materials and

11   actually have them, I'm going to need some more -- we're going

12   to need more time to look at them in order to be ready.

13        And we're asking -- because of the age of the case, we're

14   asking for remedies other than more time; but if Your Honor

15   doesn't grant those remedies, we were asking for more time.

16             THE COURT:  All right.  Let me ask the Government.

17   Is this -- again, we'll have the -- set a hearing for the *Brady*

18   violation, but is this discovery that the defense is entitled

19   to have that you think they should get more time to analyze

20   before we go to trial?

21             MR. SAX:  Yes.  I think that would be prudent.

22             THE COURT:  Okay.  All right.  What I want you all to

23   do is to confer on a trial -- actually a few different

24   suggested trial dates and let -- again, I guess, Mr. Hunt, this

25   is going to require me to set the trial date over in order to

1   have your lawyer adequately prepared.  Are you in agreement

2   with that?

3        If you're not, we're just going to make a go.

4           THE DEFENDANT:  No.  I'm looking about if you don't

5   grant the other remedies.  I want you to look at the other

6   remedies.

7           THE COURT:  No, I understand that.

8           THE DEFENDANT:  I want you to look at the other

9   remedies.  I think he cued in on forgetting another part of --

10          THE COURT:  Yeah, I haven't -- that part -- I haven't

11  ruled on that motion yet.

12          THE DEFENDANT:  Yeah, yeah, yeah, yeah, yeah.

13          THE COURT:  But what I want to make sure is that you

14  all know whether you're going to trial in two weeks.  Is there

15  any scenario by which we would be going to trial in two weeks,

16  such as the Government not using evidence?  I mean, other than

17  me dismissing the case, is there any other scenario by which we

18  could go to trial May 10th?

19          MR. SAX:  I don't think so.  I think -- in terms of

20  making a good record, I think we want to take our time on this.

21          THE COURT:  Okay.  So what I want to do is at least

22  have a trial date set.  And that doesn't mean I'm not going to

23  rule on your motion, but if there's either --

24       Because I don't think, Mr. Robb, you're asking me to

25  exclude evidence.  You say you need more time to review this

1    information.

2            MR. ROBB:  No.  One of the remedies is to exclude

3    witness testimony and other aspects of the case that are

4    relevant to the new material.  I think that my -- the two -- if

5    Your Honor grants that, I think the Government may not be able

6    to proceed with the case.  So I think we're kind of back in the

7    same position.

8         But, no, I've made a motion to dismiss and, in the first

9    alternative, to exclude the Government from using evidence that

10    I would need to review this new material for; and if we don't

11    have to deal with that evidence at trial, we're happying to go

12    to trial on May 10th.

13            THE COURT:  What is that evidence?

14            MR. ROBB:  So there's one witness that I forgot to

15    mention.  So one of the Government's -- one of the Government's

16    primary cooperators was engaged in additional drug trafficking

17    that -- as she was cooperating.  I just got those recently; so

18    we would be moving to exclude her as a witness.  We would be

19    moving to exclude the text message correspondence between

20    Mr. Olivo-Altheimer and Mr. Hunt and moving to exclude -- I

21    think I -- this is my motion, but sort of other --

22            THE COURT:  Yeah.

23            MR. ROBB:  -- other -- moving to exclude the

24    testimony of Etrece Brazzle, PR Suebsang, the Olivo-Altheimer

25    text messages; and because of the issues with the -- with the

timing of the discovery and related to the motion to suppress

timing, I would also be moving to exclude evidence related to

that motion, but that is sort of -- I think the primary

exclusion would be PR Suebsang, Etrece Brazzle, and

Rylie Jones.

I wasn't prepared to address this, but I address this in

writing in my motion.

THE COURT:  All right.  I'm assuming the Government

would rather have me continue the case than --

MR. SAX:  We really need to be able to brief and

address the motion to dismiss.  And then after that, I think

the dust will settle, and we will have a better sense of sort

of where we're at.

THE COURT:  Okay.  So if --

Jake, do we have a date that we could set for the motions?

Maybe I can rule just on the briefing, but I'm not sure

about that.  I probably should give each of you a chance to

have some argument on the motion to dismiss and the other

discovery issues.

DEPUTY COURTROOM CLERK:  So if Government's response

is going to be due Monday, do you want a chance to reply for

the --

MR. SAX:  There's two different briefs.  There's the

motion to dismiss for speedy trial.  The Government is going to

respond on Monday.  And then the other motion to dismiss is the

1   Government's going to respond on the 22nd.

2           DEPUTY COURTROOM CLERK:  22nd.

3       And if there's any reply, I don't know, but --

4           THE COURT:  Then we're already in May.

5       The first week in May?  Could we do it the Friday of the

6   first week of May?

7           DEPUTY COURTROOM CLERK:  That's when we have our

8   pretrial conference in the case.

9           THE COURT:  Is there a reason we can't push this case

10  potentially just another two weeks?

11          DEPUTY COURTROOM CLERK:  Millegan, possibly.

12          THE COURT:  Millegan is not until June.

13          DEPUTY COURTROOM CLERK:  Yeah, that's June 6th.

14          THE COURT:  Mr. Robb, you had some sort of conflict;

15  right?

16          MR. ROBB:  I have two trials in Douglas County on

17  June -- or excuse me -- May 25th and 26th and then June 1st and

18  2nd.

19          THE COURT:  I'm sorry.  Can you give me the dates

20  again?

21          MR. ROBB:  Yeah.  May 25th and 26th and June 1st and

22  2nd.

23          THE DEFENDANT:  Ms. Immergut, can I say something?

24          THE COURT:  Ask your lawyer first if he wants you

25  to tell me.

1          THE DEFENDANT:  It ain't nothing like that.  I'm on

2    medication.  I'm on water pills.  Can I use the restroom?

3          THE COURT:  Okay.  You gotta go.  Okay.

4          THE DEFENDANT:  Can I use the restroom, please?

5          THE COURT:  Yeah, yeah.

6       Do you mind, Mr. Hunt, if we talk about calendar?

7          THE DEFENDANT:  Yes, ma'am, you can.

8                (Mr. Hunt leaves the courtroom.)

9          THE COURT:  So when you all discussed this, did you

10   come up with potential dates?

11         MR. ROBB:  We came up with October 10th.

12         MR. SAX:  We're assuming you're not available August

13   and September.

14         THE COURT:  How about early July?

15         MR. ROBB:  My first child is due currently July 1st;

16   so I'm trying to keep at least the two months open in case

17   there's some medical reasons I can't be locked up in trial.

18         THE COURT:  Congratulations.

19         MR. ROBB:  Thank you.

20         THE COURT:  All right.  Why don't I -- well, I do

21   want to make sure that we have a clear record of Mr. Hunt

22   agreeing to the continuance.  I know it's a little bit -- what

23   I can do is maybe keep the current trial date now.  When he

24   comes back -- I mean, I do want him -- it's a conditional

25   waiver.  Obviously, if I don't dismiss the case, then it sounds

 1    like everyone is in agreement that it would be -- all right.

 2                    (Mr. Hunt returns to the courtroom.)

 3              THE COURT:  Mr. Hunt, so this is where we're at in

 4    terms of scheduling:  I'm going to keep the current trial date

 5    and have the lawyers give me some new proposed dates for trial.

 6              THE DEFENDANT:  Yes, ma'am.

 7              THE COURT:  I am going to still consider -- we're

 8    going to have a hearing on your other motions, let's say,

 9    May --

10         Jake, when do you want to have them then?  May -- is it at

11    the end of that May --

12              DEPUTY COURTROOM CLERK:  So --

13              THE COURT:  Our pretrial conference date.

14              DEPUTY COURTROOM CLERK:  That's the 6th.

15              THE COURT:  So May 6th can we have a hearing on all

16    these other motions?  Because you're already supposed to be

17    with me.  Okay?  And I think the briefing should be done by

18    now.

19         So I do -- in the meantime, I do want the Government to be

20    considering -- I haven't yet ruled on the issues raised in the

21    Jones case.  Again, I would -- I want to consider whether very

22    limited information and whether the Ninth Circuit would think

23    that very limited information should be disclosed to the

24    defense.  I am mindful of the sensitivity of the information

25    that you've been talking about, and I may need a better record

1    of that in order -- if I am going to deny the motion, but I

2    want to make sure that we don't find out later that there's

3    some *Brady* information in there.

4         Again, looking at it from the defense's perspective.

5         Mr. Hunt, I need to know from you that knowing -- I mean,

6    we can go to trial on May 10th.  Your lawyer is telling me he

7    thinks it's in your best interest to be able to review all of

8    this new material.

9              THE DEFENDANT:  Yes, ma'am.

10             THE COURT:  And I need to know that you're -- again,

11   if I don't dismiss your case, that you are on board with

12   setting the case out further.

13             THE DEFENDANT:  Yeah.

14             THE COURT:  Are you?

15             MR. ROBB:  I think pursuant to the written waiver,

16   you would consent to that time?

17             THE DEFENDANT:  Yeah.

18             THE COURT:  Because I would find -- again, I'm going

19   to analyze whether there has been a speedy trial violation

20   already.  They filed a motion; but, obviously, you're now --

21   you would be asking for more time in order to do further

22   investigation that your lawyers think is in your best interest.

23             THE DEFENDANT:  More time based on, like, 60 days or

24   70 days?

25             THE COURT:  Well, the difficulty is there -- you've

1   got four lawyers here, each of who has different -- they have

2   different things going on.

3                 THE DEFENDANT:  Yeah.

4                 THE COURT:  It's possible, if I can -- I mean, I

5   don't mind asking the Millegan lawyers potentially -- I just

6   don't know how many witnesses they have subpoenaed -- that's

7   set for June -- it's a two-week period in June -- to -- because

8   Mr. Hunt is in custody, to see if there's some wiggle room with

9   that case.  That's also an old case.

10       But it would depend, really, on how it affects their

11   witnesses, since you would already be moving witnesses; but

12   that's another -- what are our dates for Millegan?

13                 DEPUTY COURTROOM CLERK:  June 6th for the trial.

14                 THE COURT:  June 6th is when trial starts in that

15   case and I --

16                 DEPUTY COURTROOM CLERK:  June 7th.  Tuesday.  Sorry.

17   I carved out two weeks for that.

18       So if that -- I know that conflicts with some of the

19   things you have, Mr. Robb; but with the difficulty of moving

20   this --

21                 MR. ROBB:  I think I could do a June 6th or 7th

22   trial.

23       Oh, but apparently Ms. Thibeault is telling me she's out

24   of state that period of time.

25                 THE COURT:  Okay.  That whole week or --

1          MS. THIBEAULT:  I am out of state until June 7th, and

2     then I have another trial scheduled to go the 8th.  I'm happy

3     to -- most of my cases are out of Washington County Circuit

4     Court.  I'm happy to, you know, look at that and talk to my

5     presiding judge out there about the situation here.  I just

6     can't guarantee that that would become available right at this

7     juncture.  I'm happy to brainstorm ways to figure it out,

8     but --

9          THE COURT:  So let's -- yeah, so I'm going to need to

10    talk to -- if that works -- otherwise, for the Government,

11    presumably, you might have to check with some of your

12    witnesses.  But that's an -- I want to use that as a possible

13    date, if you can do it, and then I want you to get to trial.  I

14    wanted to try to advance your case before with Mr. Warren.

15         THE DEFENDANT:  Yes, ma'am.

16         THE COURT:  And he wasn't able to do it.

17      So I know we've been talking about this as soon as

18    Mr. Robb got on the case.  I know you want to go to trial, and

19    I want you to go to trial; so -- but are you willing to waive

20    your right to speedy trial to allow from here on to whatever

21    date the lawyers can come up with that works with everyone's

22    schedules?  But it could be -- we're talking about --

23    potentially October, Mr. Robb is suggesting.

24         MR. ROBB:  Mr. Hunt, you would agree to that

25    conditional -- on the conditions that you put into your written

1   waiver.  Is that true?

2              THE DEFENDANT:  Yeah.

3              THE COURT:  Okay.  And that was --

4              MR. ROBB:  It was conditional on the alternative

5   remedies not being granted.

6              THE COURT:  Correct.  Yeah.  So I'm still going to

7   consider those, but I want to make sure that we have the

8   possibility of a new date too because that's what all the

9   lawyers are telling me would be in your best interest.

10             THE DEFENDANT:  Can I ask my lawyer a quick question,

11  please?

12             THE COURT:  Sure.

13             THE DEFENDANT:  So, yeah, I agree to it -- about

14  having another trial date.

15             THE COURT:  Okay.

16             THE DEFENDANT:  I agree.  I'm not opposed to it.

17             MS. THIBEAULT:  What we have just expressed to

18  Mr. Hunt is that the defense, first and foremost, is asking for

19  a dismissal, then exclusion of evidence, and then exclusion of

20  witnesses; and only should Your Honor deny all three of those

21  requests, that, then, conditional upon that denial, Mr. Hunt

22  would waive, and that -- I believe I -- we have laid that out

23  in the written waiver.

24             THE COURT:  Right.

25             THE DEFENDANT:  Yes, ma'am.

1          THE COURT:  Okay.  So understood.

2      So I do find that the defendant has freely and voluntarily

3  consented to a conditional waiver, should we need to change the

4  trial date, and I do want the parties -- I would find that that

5  time period is excludable so that counsel can be adequately

6  prepared for trial.  Again, assuming all the evidence is going

7  to come in and I'm not going to otherwise dismiss the case

8  based on the other motions that are pending.

9          MR. ROBB:  Sorry.  Just for the record, one more

10  clarification:  I mean, one of our alternative arguments is

11  that that time should not be excluded for purposes of the

12  Speedy Trial Act.  One of our arguments for the speedy trial

13  motion is that this -- because it's essentially

14  Government-caused, this time is also countable against the

15  Government for purposes of that; but if Your Honor doesn't

16  agree with us on that, we would be -- so it's another -- I

17  mean, it's another layer.

18      I just want to make sure the record is clear so that, when

19  we're arguing this later, it's -- it -- we -- you didn't think

20  that we had already waived that.

21          THE COURT:  All right.  Understood.  So whether --

22          MR. ROBB:  A bunch of different layers.

23          THE COURT:  So I think I have to decide

24  those other -- so far we have excludable time up and through

25  the current trial date; so I'll not make a determination today

1   as to whether or not the trial or the time -- any time that

2   would be needed to continue the case in order to deal with the

3   additional discovery is excludable or not.  It depends really

4   on what is presented at the motions on that.  So far, we are in

5   excludable time and the pending motions, but -- and there

6   continue to be pending motions, at least through the current

7   trial date, because I already ordered that the last time.

8        All right.  So we have a date for the next -- for

9   briefing.

10       Anything else I need to deal with today, Mr. Sax or

11  Mr. Sussman?

12          MR. SAX:  Just a little guidance.  Do we have a

13  placeholder trial date?  I know we have a lot of witnesses.

14  Some of them need to fly, and we want to get it on their

15  calendar as soon as possible.

16          THE COURT:  So we currently have the May 10th, but I

17  want you to confer with counsel and come up with at least two

18  possible alternative trial dates, and I urge you to figure out

19  whether the June date is a possibility, and I'm going to do the

20  same, from my end, to see if the lawyers have some flexibility

21  in that case with their witnesses; but, otherwise, I -- because

22  I also want Mr. Hunt to know what are the potential changes.

23  Otherwise, we'll -- you're going to have to -- if it turns out

24  that we don't have a date that is acceptable, then I'm just

25  going to have to say we're going to trial on a particular date.

1    I know that, as I looked through the docket, as I looked

2    at all the continuances, it seemed that the length of trial

3    continued to increase a little bit from the beginning estimate

4    to the final estimate, which I think the most recent was seven

5    days.  But is that consistent with where we're at now, Mr. Sax?

6              MR. SAX:  From the Government's perspective, giving a

7    day or two for the defense, I think that's reasonable.

8              THE COURT:  So that includes a day or two for the

9    defense?

10             MR. SAX:  Yes.

11             THE COURT:  Mr. Robb, what is your best assessment?

12             MR. ROBB:  I think seven.  I think seven days total

13    is fair.  I think I had put on my own calendar ten days, just

14    because things go long and I didn't want to schedule other

15    things; but, you know --

16             THE COURT:  So I think -- at this stage, I think I do

17    need to at least vacate the current pretrial document filings

18    because I think they are due next week.

19             MR. ROBB:  On Tuesday.

20             THE COURT:  And I assume that is what everybody wants

21    me to do.

22             MR. SAX:  Yes.

23             MR. ROBB:  Please.

24             THE COURT:  Now, I think, there were several --

25    obviously, the Government had prior submissions in the last

1  case, as did the defense.  Should I assume that everything will

2  be different now or not necessarily or -- from the Government's

3  perspective?

4          MR. SAX:  I think it's like a house.  We put, you

5  know, one more story on it.  So there's a little bit more

6  information but a lot of the same stuff.

7          THE COURT:  Okay.  And I assume with new lawyers it

8  may be completely different.

9          MR. ROBB:   (Nodding head.)

10          THE COURT:  So those dates will be vacated.  I'm not

11  yet vacating the May 10th date, however, until I have new dates

12  to put the trial.  And then I will have ruled on -- but I want

13  to know from you, by email to Jake, what your possible dates

14  you can do and when witnesses will be available, and include

15  the June date in there; but, otherwise, give me as many options

16  as you can.

17      All right.  Anything else I need to -- and then I'm going

18  to follow up with a ruling on the motion to suppress that we

19  heard today, and I'll -- I think I can also rule on the Jones

20  information, but I do want to get some -- I may wait on that

21  just until we get the -- you can assume that anything not

22  related to December 12th I'm -- 2017 in the Rhodes

23  investigation/Jones investigation, that I don't find is

24  material here.  But I want to hear about just the *Brady* issues,

25  anything related to December 12th.

1          MR. SAX:  I think it's December 2nd.

2          THE COURT:  December 2nd.  Excuse me.

3          MR. SAX:  But you're referring to events that may

4  have precipitated the event on December 2nd?

5          THE COURT:  Correct.  Correct.

6          MR. SAX:  Okay.

7          THE COURT:  I think I may rule some -- I don't know.

8  I'm going to look at that.  If I can rule on the entirety, I

9  will; but I may carve out a little piece to get more

10 information about it.

11      All right.  Anything else you need to hear from me today?

12         MR. SAX:  Not from the Government.  Thank you.

13         THE COURT:  Okay.  Then we'll be in recess.  Thank

14 you.

15         MR. ROBB:  Thank you, Your Honor.

16                (Hearing concluded.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3         United States of America v. Dontae Lamont Hunt

4                       3:18-cr-00475-IM

5                        Motion Hearing

6                        April 13, 2022

7

8          I certify, by signing below, that the foregoing is a

9    true and correct transcript of the record, taken by

10   stenographic means, of the proceedings in the above-entitled

11   cause.  A transcript without an original signature, conformed

12   signature, or digitally signed signature is not certified.

13

14   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
     _____
15
     Official Court Reporter       Signature Date: 7/26/2022
16   Oregon CSR No. 98-0346        CSR Expiration Date: 9/30/2023

17

18

19

20

21

22

23

24

25